# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

BANTAM DESIGN GROUP LLC on its own behalf and
derivatively on behalf of nominal defendant GUSTAVO
CADILE LLC,

                                        *Plaintiffs,*

            -against-

MEMECA DELL'ACQUA LTD., GRMAR, LLC, STUDIO
38, LLC, RAWAFED AMERICA INC. and GUSTAVO
CADILE,

                                        *Defendants,*

            -and-

GUSTAVO CADILE LLC,

                                        *Nominal Defendant.*

**15 CV 2450**

Civil Action No.:

JUDGE KARAS

**VERIFIED
COMPLAINT**

FILED
U.S. DISTRICT COURT
S.D. OF N.Y.W.P.
2015 MAR 31   PM 3: 14

---

The plaintiff, Bantam Design Group LLC ("Bantam"), acting on its own behalf and

derivatively on behalf of nominal defendant Gustavo Cadile LLC ("GC LLC"), by its attorneys,

The Cermele Law Firm PLLC, as and for its complaint against the defendants and nominal

defendant, allege as follows:

## NATURE OF ACTION

1.      This is an action for fraudulent trademark registration, trademark infringement,

breach of contract, breach of fiduciary duties, misappropriation of trade secrets and conversion,

in connection with Bantam's approximately $500,000 investment in a company engaged in the

design, fabrication and sale of high-end women's dresses, clothing and accessories, in which an

investor was induced to invest $500,000 in exchange for the contribution of various intellectual

property, only to have the company's lead designer and majority member depart – with the

company's designs, trademarks and other intellectual property which he had agreed to contribute and which was the company's property – only to begin new ventures in direct competition with the company.

## THE PARTIES

2.      At all relevant times, Bantam was and is a limited liability company formed and existing under the laws of the State of New York, with a principal place of business at c/o Caleb Koeppel, 733 Park Avenue, 3rd Floor, New York, New York 10021.

3.      At all relevant times, GC LLC was and is a limited liability company formed and existing under the laws of the State of New York, with a principal place of business at 39 West 38th Street, Suite 4W, New York, New York 10018. GC LLC was formerly known as Gustavo Cadile II, LLC.

4.      At all relevant times, defendant Memeca Dell'Acqua Ltd. ("Memeca") was and is a corporation formed and existing under the laws of the State of New York, with a principal place of business at c/o GC LLC, 39 West 38th Street, Suite 4W, New York, New York 10018. Memeca was formerly known as Gustavo Cadile Ltd.

5.      At all relevant times, defendant GRMAR, LLC ("GRMAR") was and is a limited liability company formed and existing under the laws of the State of Delaware and conducting business in the State of New York, with a principal place of business at 260 West 36th Street, Suite 901, New York, New York 10018.

6.      At all relevant times, defendant Studio 38, LLC ("Studio 38") was and is a limited liability company formed and existing under the laws of the State of Delaware and conducting business in the State of New York, with a principal place of business at 260 West 36th Street, Suite 901, New York, New York 10018.

7.      At all relevant times, defendant Rawafed America Inc. ("Rawafed") was and is a corporation formed and existing under the laws of the State of Delaware and conducting business in the State of New York, with a principal place of business at 260 West 36th Street, Suite 901, New York, New York 10018.

8.      At all relevant times, defendant Gustavo Cadile ("Cadile") was and is an individual conducting business in the State of New York, with a principal place of business at 260 West 36th Street, Suite 901, New York, New York 10018.

### JURISDICTION AND VENUE

9.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1338 and 1367.

10.     This court has both general and specific jurisdiction over each of GC LLC, Memeca, GRMAR, Studio 38, Rawafed and Cadile. Each of GC LLC, Memeca, GRMAR, Studio 38, Rawafed and Cadile have their respective principal places of business located in this district. Moreover, the defendants operate their businesses using GC LLC's trademarks, which are a subject of this lawsuit, in this district.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to these claims occurred there. Specifically, the transactions between the parties and infringing conduct of the defendants all occurred in this district.

### FACTS

12.     Cadile is a fashion designer engaged in the design, manufacture, marketing and sale of high-end women's clothing and accessories. Prior to November, 2009, Cadile conducted his business through Memeca – a corporation he owned and controlled.

3

13.     During that time, Cadile and Memeca designed under the trademarks "GUSTAVO CADILE", "MEMECA" and "MEMEKA" (collectively, the "Marks") and the products and marketing materials produced bore those trademarks.

14.     In or about 2009, Caleb Koeppel, the manager of Bantam, was introduced to Cadile and the two entered into discussions regarding a business relationship and the potential for certain entities affiliated with Mr. Koeppel, including Bantam, to lend to or invest monies in Cadile or Memeca.

15.     Beginning in or about May, 2009, at the request of Cadile and Memeca, Bantam and certain of its affiliates made a series of loans to Memeca, totaling approximately $145,000.

16.     Following the initial loan to Memeca, and at Cadile's request, Cadile and Mr. Koeppel continued to discuss a larger investment by Bantam in Cadile's fashion business.

17.     As a result of those negotiations, on or about November 3, 2009, Bantam and Memeca caused the formation of GC LLC for the purposes of obtaining certain assets of Memeca and an investment by Bantam.

18.     In connection with the formation of GC LLC, Bantam and Memeca entered into an Operating Agreement of GC LLC, which governs the affairs of that entity, dated November 5, 2009 (the "Operating Agreement"). A copy of the Operating Agreement is attached hereto as **Exhibit A**.

19.     At the same time, Bantam, Memeca and GC LLC entered into a Contribution and Exchange Agreement, also dated November 5, 2009 (the "Contribution Agreement"), pursuant to which each of Bantam and Memeca contributed certain assets to GC LLC in exchange for membership interests in GC LLC. A copy of the Contribution Agreement is attached hereto as **Exhibit B**.

4

20.     Pursuant to the Contribution Agreement, GC LLC acquired all of Memeca's right, title and interest in "all intellectual property of [Memeca], including, without limitation, trademarks, trade names, service marks, copyrights (including the name "Gustavo Cadile" and any and all derivatives thereof)," as well as other assets involved in the previous operations of Memeca's business, such as "customer lists and files."

21.     Also, each of Memeca and Cadile represented and warranted to Bantam and GC LLC in the Contribution Agreement that, as of the date thereof, Memeca "owns or has valid licenses to use" all such intellectual property used by it in the ordinary course of its business. At that time, Memeca regularly used each of the Marks in the ordinary course of its business.

22.     In addition to converting the prior loans to an equity investment, Bantam invested an additional approximately $360,000 in GC LLC pursuant to the Contribution Agreement.

23.     Also at the same time as the Operating Agreement and Contribution Agreement were entered into, Cadile entered into an Employment Agreement, also dated November 5, 2009 (the "Employment Agreement"), pursuant to which Cadile became employed by GC LLC. A copy of the Employment Agreement is attached hereto as **Exhibit C**.

24.     Pursuant to the Employment Agreement, Cadile agreed that all work product and confidential information relating to GC LLC's business or created during Cadile's employment was the property of GC LLC. Without limitation, this included "all creative products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created" by Cadile during his employment by GC LLC.

25.     In addition, Cadile agreed that for a period of three (3) years from the date his employment by GC LLC terminated, he would not "directly or indirectly enter into, start or conduct any business if the same is competitive in any way with the primary business of" GC

5

LLC. The Employment Agreement defined the primary business of GC LLC as "the design and/or sale of women's dresses."

26.     On or about September 22, 2011, without prior notice to Bantam, Cadile notified GC LLC that he was terminating his employment with GC LLC.

27.     As of the date of the termination of Cadile's employment, Memeca continued to be a member of GC LLC. To this date, Memeca remains a member of GC LLC.

28.     As of the date of the termination of Cadile's employment, the Marks continued to be owned by GC LLC. To this date, the Marks continue to be owned by GC LLC. In fact, shortly after Cadile's employment with GC LLC ended, Bantam notified Cadile that GC LLC continued to own the Marks.

29.     Despite the unconditional covenant in the Employment Agreement not to compete with GC LLC, Bantam recently learned that upon terminating his employment with GC LLC (and while Memeca remained a member of GC LLC), Cadile was engaged in planning and forming a new business venture which would directly compete with GC LLC.

30.     Upon leaving the employment of GC LLC, Cadile used many of the creative products, intellectual property, inventions, concepts, designs, garments or ideas conceived during his employment in furtherance of his competing business ventures. Specifically, and without limitation, Cadile, directly, and upon information and belief, through and for the benefit of each of Memeca, GRMAR, Studio 38 and Rawafed, engaged in the business of designing, fabricating and selling women's clothing using the creative products, intellectual property, inventions, concepts, designs, garments or ideas conceived during his employment by GC LLC.

31.     On or about August 17, 2012, unbeknownst to Bantam and despite having caused Memeca to have previously sold and conveyed its rights to the trademark "GUSTAVO

6

CADILE" to GC LLC, Cadile caused GRMAR to file a trademark application for the "GUSTAVO CADILE" trademark, which was subsequently issued as U.S. Trademark Reg. No. 4390867. The trademark application was filed for "[c]lothing, namely, gowns, dresses, skirts, tops, bottoms, wraps, [and] jackets," all of which products were in direct competition with those being marketed and sold by GC LLC.

32.     Upon information and belief, GRMAR is owned and/or controlled by Cadile. GRMAR's application to register the "GUSTAVO CADILE" trademark was consented to by Cadile.

33.     Cadile and GRMAR caused this application to be filed knowing full well that GC LLC was the owner of the "GUSTAVO CADILE" trademark, and that GC LLC had been using the trademark in commerce prior to GRMAR.

34.     In fact, despite having been formed in 2011, GRMAR claimed in its trademark application to have first used the "GUSTAVO CADILE" trademark in commerce prior to March 31, 2007.

35.     In connection with GRMAR's application to register the "GUSTAVO CADILE" trademark, GRMAR and Cadile caused their attorneys to falsely declare to the United States Patent and Trademark Office (the "USPTO") that, to the best of their knowledge and belief, "no other person, firm, corporation, or association has the right to use the mark in commerce."

36.     In light of the conveyance of the "GUSTAVO CADILE" trademark to GC LLC and Cadile's affiliation with both Memeca and GRMAR, this declaration was knowingly false and misleading.

37.     Similarly, on or about April 1, 2013, unbeknownst to Bantam and despite having caused Memeca to have previously sold and conveyed its rights to the trademark "MEMEKA" to

7

GC LLC, Cadile caused GRMAR to file a trademark application for the "MEMEKA" trademark, which was subsequently issued as U.S. Trademark Reg. No. 4432228. The trademark application was filed for "gowns, dresses, skirts, tops, [and] bottoms," all of which products were in direct competition with those being marketed and sold by GC LLC.

38.     Cadile and GRMAR caused this application to be filed knowing full well that GC LLC was the owner of the "MEMEKA" trademark, and that GC LLC had been using the trademark in commerce prior to GRMAR.

39.     GRMAR claimed in its trademark application to have first used the "MEMEKA" trademark in commerce prior to December 31, 2011.

40.     In connection with GRMAR's application to register the "MEMEKA" trademark, GRMAR and Cadile caused their attorneys to falsely declare to the USPTO that, to the best of their knowledge and belief, "no other person, firm, corporation, or association has the right to use the mark in commerce."

41.     In light of the conveyance of the "MEMEKA" trademark to GC LLC and Cadile's affiliation with both Memeca and GRMAR, this declaration was knowingly false and misleading.

42.     In or about February, 2015, shortly after learning of the fraudulent registration by GRMAR and Cadile of the "GUSTAVO CADILE" and "MEMEKA" trademarks, Bantam demanded that Memeca, GRMAR and Cadile immediately assign the registrations to GC LLC, and thereafter, protect all of GC LLC's rights therein.

43.     Rawafed, which upon information and belief, is a member or owner of Memeca and GRMAR, responded on behalf of Memeca, GRMAR and Cadile and rejected Bantam's demand.

44.     Thereafter, Bantam filed this action, both on its own behalf and derivatively on behalf of GC LLC. Memeca, GRMAR, Studio 38, Rawafed and Cadile continue to use the Marks without GC LLC's permission. The continued use of GC LLC's trademarks is causing injury to GC LLC.

45.     Upon information and belief, the continued use by Memeca, GRMAR, Studio 38, Rawafed and Cadile of GC LLC's trademarks constitutes willful infringement.

46.     As a result of the infringement by Memeca, GRMAR, Studio 38, Rawafed and Cadile, GC LLC and Bantam are entitled to recover any profits made by any of them, any damages sustained by each of GC LLC and Bantam, and the costs of this action.

47.     Unless enjoined, use of the trademarks by Memeca, GRMAR, Studio 38, Rawafed and Cadile will continue to cause irreparable harm to GC LLC and Bantam.

48.     Memeca, GRMAR, Studio 38, Rawafed and Cadile continue to use the creative products, intellectual property, inventions, concepts, designs, garments or ideas conceived during Cadile's employment by GC LLC, which are the property of GC LLC, in violation of the Employment Agreement.

49.     As a result of the use of GC LLC's creative products, intellectual property, inventions, concepts, designs, garments and ideas, GC LLC and Bantam are entitled to recover any profits made by any of Memeca, GRMAR, Studio 38, Rawafed and Cadile, any damages sustained by each of GC LLC and Bantam, and the costs of this action.

50.     Unless enjoined, use of the creative products, intellectual property, inventions, concepts, designs, garments and ideas by Memeca, GRMAR, Studio 38, Rawafed and Cadile will continue to cause irreparable harm to GC LLC and Bantam.

9

<u>**ALLEGATIONS PURSUANT TO RULE 23.1**</u>

51.　　At all times relevant to the transactions and circumstances alleged herein, Bantam

was a member of GC LLC and the owner of thirty-five percent (35%) of the membership

interests therein.  Memeca is the owner of the remaining sixty-five percent (65%) of the

membership interests in GC LLC.

52.　　This action is not a collusive action to confer jurisdiction that the court would

otherwise lack.

53.　　As alleged above, Bantam demanded that Memeca, the majority owner of GC

LLC take steps necessary to protect the rights of GC LLC in the intellectual property which is

the subject of this action.  Therein, Bantam notified Memeca that if it refused to protect the rights

of GC LLC, Bantam intended to do so on behalf of GC LLC.  A copy of Bantam's February 10,

2015 letter to Memeca is attached hereto as **Exhibit D**.

54.　　Memeca has refused to take any such action.  In any event, because any such

action by Memeca would result in it seeking relief against itself, its principals and their affiliated

entities, the demand was likely futile.

<u>**COUNT I – FRAUDULENT TRADEMARK REGISTRATION**</u>
**(Against GRMAR and Studio 38)**

55.　　Bantam repeats and realleges each and every allegation set forth in paragraphs "1"

through "54" of this complaint with the same force and effect as if fully set forth at length herein.

56.　　On August 17, 2012, GRMAR caused a trademark application for the

"GUSTAVO CADILE" mark to be filed with the USPTO.

57.　　On April 1, 2013, GRMAR caused a trademark application for the "MEMEKA"

mark to be filed with the USPTO.

58.     In connection with each such application, GRMAR caused its attorneys to declare to the USPTO that "he/she believes the applicant to be entitled to use such mark in commerce" and "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive."

59.     Each of Memeca and GRMAR are owned and/or controlled by Cadile.

60.     Cadile was aware of GC LLC's ownership of the "GUSTAVO CADILE" and "MEMEKA" marks and that GC LLC had the right to such marks in commerce.

61.     Upon information and belief, GRMAR knew that it caused its attorneys to make false, or at a minimum, misleading, statements about GC LLC's ownership and interests in the marks.

62.     Upon information and belief, GRMAR intended to induce the USPTO into allowing registration of the marks.

63.     Upon information and belief, the USPTO relied upon the declaration of GRMAR's attorneys in allowing registration of the marks.

64.     GC LLC has been and continues to be damaged by the continued maintenance of GRMAR's fraudulently obtained registrations for the "GUSTAVO CADILE" and "MEMEKA" marks.

65.     Upon information and belief, the fraudulently obtained registrations for the "GUSTAVO CADILE" and "MEMEKA" marks may have been assigned and/or transferred by GRMAR to Studio 38, which is another entity affiliated with and controlled by Cadile.

66. GRMAR's Registration No. 4390867 for the "GUSTAVO CADILE" mark is invalid because it was fraudulently obtained and is subject to cancellation by this court pursuant to 15 U.S.C. § 1119.

67. GRMAR's Registration No. 4432228 for the "MEMEKA" mark is invalid because it was fraudulently obtained and is subject to cancellation by this court pursuant to 15 U.S.C. § 1119.

## COUNT II – TRADEMARK INFRINGEMENT
### (Against Memeca, GRMAR, Studio 38, Rawafed and Cadile)

68. Bantam repeats and realleges each and every allegation set forth in paragraphs "1" through "67" of this complaint with the same force and effect as if fully set forth at length herein.

69. Upon information and belief, the unauthorized use of the "GUSTAVO CADILE" and "MEMEKA" marks by each of Memeca, GRMAR, Studio 38, Rawafed and Cadile is likely to cause confusion, or to cause mistake, or to deceive as the affiliation, connection, or association of GC LLC with each of Memeca, GRMAR, Studio 38, Rawafed and Cadile.

70. Upon information and belief, the unauthorized use of the "GUSTAVO CADILE" and "MEMEKA" marks by each of Memeca, GRMAR, Studio 38, Rawafed and Cadile conveys the misleading commercial impression to the fashion industry and the public in general that the goods and services sold by each of Memeca, GRMAR, Studio 38, Rawafed and/or Cadile are approved by, sponsored by or somehow affiliated with GC LLC and its goods and services, all to the detriment of GC LLC and the public.

71. Unauthorized use by each of Memeca, GRMAR, Studio 38, Rawafed and Cadile of the "GUSTAVO CADILE" and "MEMEKA" marks is a violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.

72.     Pursuant to 15 U.S.C. § 1116, Bantam, on behalf of GC LLC, is entitled to a preliminary and permanent injunction against further infringement.

73.     Pursuant to 15 U.S.C. § 1117, Bantam, on behalf of GC LLC, is entitled to the profits earned by each of Memeca, GRMAR, Studio 38, Rawafed and Cadile, any damages suffered by GC LLC, and the costs of this action.

### COUNT III – STATE LAW TRADEMARK DILUTION
### (Against Memeca, GRMAR, Studio 38, Rawafed and Cadile)

74.     Bantam repeats and realleges each and every allegation set forth in paragraphs "1" through "73" of this complaint with the same force and effect as if fully set forth at length herein.

75.     The "GUSTAVO CADILE" and "MEMEKA" marks are notorious and famous in the State of New York and were notorious and famous in the State of New York prior to the unauthorized adoption and commencement of use thereof by each of Memeca, GRMAR, Studio 38, Rawafed and Cadile.

76.     The acts complained of herein violate General Business Law Section 360-l, in that the conduct of Memeca, GRMAR, Studio 38, Rawafed and Cadile have and will continue to blur and/or tarnish GC LLC's distinctive and notorious marks.

77.     The unauthorized adoption and use of the "GUSTAVO CADILE" and "MEMEKA" marks by Memeca, GRMAR, Studio 38, Rawafed and Cadile has and will cause the fashion industry and the general public to negatively associate GC LLC's marks with unsavory and substandard goods and services such that GC LLC's reputation and the value of its marks will severely decrease.

78.     The acts of Memeca, GRMAR, Studio 38, Rawafed and Cadile have been willful, and have unlawfully and wrongfully deprived income and profits from GC LLC and Memeca, GRMAR, Studio 38, Rawafed and Cadile have been unjustly enriched as a result.

13

79.     Bantam and GC LLC have no adequate remedy at law.

80.     Bantam and GC LLC has sustained, and continues to sustain, and unless Memeca, GRMAR, Studio 38, Rawafed and Cadile are enjoined will continue to sustain, substantial irreparable injury.

### COUNT IV – BREACH OF EMPLOYMENT AGREEMENT
### (Against Cadile)

81.     Bantam repeats and realleges each and every allegation set forth in paragraphs "1" through "80" of this complaint with the same force and effect as if fully set forth at length herein.

82.     Pursuant to the terms of the Employment Agreement, Cadile agreed that "all creative products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created" by Cadile during his employment by GC LLC were the property of GC LLC. Cadile further agreed that all client lists and knowledge of GC LLC's production resources and vendors was confidential and proprietary and belonged to GC LLC.

83.     Since on or about October 14, 2011, Cadile has breached, and continues to breach, the Employment Agreement by (i) using the "creative products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created" by Cadile during his employment by GC LLC for his own purposes and those of Memeca, GRMAR, Studio 38 and Rawafed, (ii) using the clients lists and knowledge of GC LLC's production resources and vendors for his own purposes and those of Memeca, GRMAR, Studio 38 and Rawafed, and (iii) competing with GC LLC.

84.     As a direct and proximate result of the breaches by Cadile or the Employment Agreement, GC LLC has sustained damages and continues to be irreparably harmed.

85.     Bantam and GC LLC have no adequate remedy at law.

86. By virtue of the breaches of the Employment Agreement by Cadile, GC LLC has been irreparably damaged, and continues to be irreparably harmed. Accordingly, Bantam demands judgment against Cadile, on behalf of GC LLC, in an amount to be proven at trial but reasonably believed to be at least $750,000, along with a judgment permanently enjoining Cadile from using (i) using the "creative products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created" by Cadile during his employment by GC LLC for his own purposes and those of any other entity, and (ii) using the clients lists and knowledge of GC LLC's production resources and vendors for his own purposes and those of any other entity.

### COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Memeca and Cadile)

87. Bantam repeats and realleges each and every allegation set forth in paragraphs "1" through "86" of this complaint with the same force and effect as if fully set forth at length herein.

88. Memeca owes a fiduciary duty to GC LLC by virtue of its status as a member of GC LLC. By virtue of its fiduciary obligations, Memeca owed and continues to owe GC LLC the highest obligation of good faith, fair dealing, loyalty and due care.

89. Cadile owes a fiduciary duty to GC LLC as a manager of GC LLC. By virtue of his fiduciary obligations, Cadile owed and continues to owe GC LLC the highest obligation of good faith, fair dealing, loyalty and due care.

90. Upon information and belief, Memeca and Cadile have acted in bad faith in derogation of their fiduciary responsibilities to GC LLC.

91. Memeca and Cadile have breached their fiduciary duties of due care, loyalty, reasonably inquiry, oversight, good faith and supervision.

92. Memeca and Cadile breached their fiduciary duties by (i) converting the "GUSTAVO CADILE" and "MEMEKA" marks for their own use, (ii) using the "creative

15

products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created" by Cadile during his employment by GC LLC for their own purposes and those of GRMAR, Studio 38 and Rawafed, (iii) using the clients lists and knowledge of GC LLC's production resources and vendors for their own purposes and those of GRMAR, Studio 38 and Rawafed, and (iv) competing with GC LLC.

93.     As a direct and proximate result of the breaches by Memeca and Cadile of their fiduciary duties, GC LLC has sustained significant damages.

94.     By virtue of the breaches by Memeca and Cadile of their fiduciary duties, GC LLC has been irreparably damaged, and continues to be irreparably harmed. Accordingly, Bantam demands judgment against Cadile, on behalf of GC LLC, in an amount to be proven at trial but reasonably believed to be at least $750,000.

### COUNT VI – MISAPPROPRIATION OF TRADE SECRETS
### (Against Memeca, GRMAR, Studio 38, Rawafed and Cadile)

95.     Bantam repeats and realleges each and every allegation set forth in paragraphs "1" through "94" of this complaint with the same force and effect as if fully set forth at length herein.

96.     GC LLC possesses trade secrets and proprietary knowledge concerning its creative products, intellectual property, inventions, concepts, designs, garments, marketing a development plans, cost and pricing details, product strategies, and vendor relationships, that is kept confidential and is unavailable from public sources.

97.     Memeca and Cadile, on their own behalves and through GRMAR, Studio 38 and Rawafed, have converted the trade secrets and proprietary knowledge and information of GC LLC for their own purposes.

16

98.     Memeca, GRMAR, Studio 38, Rawafed and Cadile have misappropriated GC

LLC's trade secrets and proprietary knowledge in breach of their agreements, confidences and

duties with and to GC LLC or as a result of discovery by improper means.

99.     As a direct and proximate result of the misappropriation of GC LLC's trade

secrets and proprietary knowledge, GC LLC has sustained significant damages.

100.    By virtue of the misappropriation of its trade secrets and proprietary knowledge,

GC LLC has been irreparably damaged, and continues to be irreparably harmed.  Accordingly,

Bantam demands judgment against Memeca, GRMAR, Studio 38, Rawafed and Cadile, on

behalf of GC LLC, in an amount to be proven at trial but reasonably believed to be at least

$750,000.

### COUNT VII – CONVERSION
### (Against Memeca, GRMAR, Studio 38, Rawafed and Cadile)

101.    Bantam repeats and realleges each and every allegation set forth in paragraphs "1"

through "100" of this complaint with the same force and effect as if fully set forth at length

herein.

102.    GC LLC was and still is entitled to the possession of its property, including

without limitation, the "GUSTAVO CADILE" and "MEMEKA" marks, the intellectual

property, designs, trade secrets and proprietary information of GC LLC.

103.    Since in or about October, 2011, Memeca and Cadile, on their own behalves and

through GRMAR, Studio 38 and Rawafed, have taken the assets of GC LLC from GC LLC's

possession and converted the same to their own use.

104.    Bantam has demanded the return of the assets belonging to GC LLC on behalf of

GC LLC, but Memeca, GRMAR, Studio 38, Rawafed and Cadile have refused to return such

assets to GC LLC.

105.    As a direct and proximate result of the conversion of GC LLC's assets, GC LLC has sustained significant damages.

106.    By virtue of the breaches by Memeca and Cadile of their fiduciary duties, GC LLC has been irreparably damaged, and continues to be irreparably harmed.  Accordingly, Bantam demands judgment against Memeca, GRMAR, Studio 38, Rawafed and Cadile, on behalf of GC LLC, in an amount to be proven at trial but reasonably believed to be at least $750,000.

WHEREFORE, Bantam demands judgment on behalf of GC LLC as follows:

(i)    On the first count, the cancellation of GRMAR's Trademark Registration Nos. 4390867 and 4432228 for the "GUSTAVO CADILE" and "MEMEKA" marks, respectively;

(ii)    On the second count, temporary and permanent injunctive relief enjoining the defendants and those in privity with them from infringing upon GC LLC's "GUSTAVO CADILE" and "MEMEKA" marks and from making fraudulent representations in violation of the Lanham Act, the damages together with prejudgment interest caused by defendants' use of such marks and such fraudulent representations, including but not limited to, GC LLC's actual damages and all revenues and profits made by the defendants as a result of the infringement, and the attorneys' fees and expenses incurred in prosecuting this action;

(iii)    On the third count, temporary and permanent injunctive relief enjoining the defendants and those in privity with them from infringing upon GC LLC's "GUSTAVO CADILE" and "MEMEKA" marks and from making fraudulent representations in violation of New York state law, the damages together with prejudgment interest caused by defendants' use of such marks and such fraudulent representations, including but not limited to, GC LLC's actual damages and all revenues and profits made by the defendants as a result of the infringement, and the attorneys' fees and expenses incurred in prosecuting this action;

(iv)    On the fourth count, temporary and injunctive relief enjoining Cadile and those in privity with him from (a) using the work product created during his employment by GC LLC for his own purposes and those of Memeca, GRMAR, Studio 38 and Rawafed, and (b) using the clients lists and knowledge of GC LLC's production resources and vendors for his own purposes and those of Memeca, GRMAR, Studio 38 and Rawafed, the damages together with prejudgment interest caused by Cadile's breaches of the Employment Agreement, and the attorneys' fees and expenses incurred in prosecuting this action;

(v)     On the fifth count, damages together with prejudgment interest caused by the breaches of fiduciary duty by Memeca and Cadile, and the attorneys' fees and expenses incurred in prosecuting this action;

(vi)    On the sixth count, damages together with prejudgment interest caused by the misappropriation of trade secrets by Memeca, GRMAR, Studio 38, Rawafed and Cadile, and the attorneys' fees and expenses incurred in prosecuting this action;

(vii)   On the seventh count, damages together with prejudgment interest caused by the conversion of GC LLC's assets by Memeca, GRMAR, Studio 38, Rawafed and Cadile, and the attorneys' fees and expenses incurred in prosecuting this action; and

(viii)  The costs and disbursements of this action, and such other and further relief as the Court deems fair and just under the circumstances.

Dated:      March 19, 2015
            White Plains, New York

                          Yours, etc.
                          THE CERMELE LAW FIRM PLLC

                          By: _____
                              Mark Cermele (MC-4596)
                              *Attorneys for Plaintiff*
                              2 Westchester Park Drive, Suite 205
                              White Plains, New York 10604
                              (914) 967-2753
                              mc@mcnylawfirm.com

## **VERIFICATION**

I, CALEB KOEPPEL, declare as follows:

1.      I am the manager of Bantam Design Group LLC ("Bantam"), the plaintiff in this action.  I am authorized to make this verification on behalf of Bantam.

2.      I have personal knowledge of Bantam and its activities, including as a member of Gustavo Cadile LLC.

3.      I declare that I have read the foregoing complaint, and that the facts alleged therein are true and correct to the best of my knowledge and belief.  I understand that a false statement in this verification will subject me to penalties of perjury.

_____
CALEB KOEPPEL

Sworn and subscribed to before
Me this 2 6th   day of March, 2015.

_____
NOTARY

MICHAEL BARBER
Notary Public, State of New York
No. 01BA6257437
Qualified in Bronx County
Commission Expires 5-12-16

# OPERATING AGREEMENT

## OF

## GUSTAVO CADILE II, LLC

# TABLE OF CONTENTS

**ARTICLE 1.** DEFINITIONS ........................................................................................... 1

**ARTICLE 2.** ORGANIZATION AND TERM ................................................................. 4

SECTION 2.1   Formation. .................................................................................. 4
SECTION 2.2   Term. .......................................................................................... 5
SECTION 2.3   Registered Agent and Officer. ................................................... 5
SECTION 2.4   Principal Place of Business. ....................................................... 5
SECTION 2.5   Other Instruments. ...................................................................... 5
SECTION 2.6   Scope of Members' Authority. .................................................... 5

**ARTICLE 3.** PURPOSE AND POWERS OF THE COMPANY .................................. 6

SECTION 3.1   Purposes. ..................................................................................... 6
SECTION 3.2   Powers of the Company. ............................................................. 6

**ARTICLE 4.** MEMBER'S CAPITAL CONTRIBUTIONS AND INTERESTS.......................... 6

SECTION 4.1   Capital Contributions. ................................................................. 6
SECTION 4.2   Interests. ...................................................................................... 6
SECTION 4.3   No Requirement of Additional Contributions. ........................... 6
SECTION 4.4   Call for Additional Funds............................................................ 6
SECTION 4.5   Withdrawals and Interest............................................................. 7
SECTION 4.6   Return of Capital. ....................................................................... 7
SECTION 4.7   Capital Accounts. ....................................................................... 7
SECTION 4.8   Liability. ..................................................................................... 8

**ARTICLE 5.** RIGHTS AND DUTIES OF THE MANAGERS AND THE MEMBERS............ 9

SECTION 5.1   Management................................................................................. 9
SECTION 5.2   Certain Powers of Bantam.......................................................... 9
SECTION 5.3   Certain Powers of Gustavo ....................................................... 10
SECTION 5.4   Certain Powers of Members ......................................................
SECTION 5.5   Number and Election of Managers............................................ 11
SECTION 5.6   Regular Meetings. ..................................................................... 11
SECTION 5.7   Special Meetings. ...................................................................... 11
SECTION 5.8   Place of Meeting; Waiver of Notice.......................................... 11
SECTION 5.9   Action Without a Meeting.......................................................... 11
SECTION 5.10  Telephonic Attendance at Meeting............................................ 11
SECTION 5.11  Vacancies................................................................................... 11
SECTION 5.12  Chairman of the Board. ............................................................. 12
SECTION 5.13  Compensation of Managers........................................................ 12
SECTION 5.14  Officers...................................................................................... 12
SECTION 5.15  Financial Manager...................................................................... 12
SECTION 5.16  Vacancies................................................................................... 12
SECTION 5.17  No Management Powers of the Members. .................................. 13
SECTION 5.18  Bank Accounts. ......................................................................... 13
SECTION 5.19  Indemnity................................................................................... 13

973279                                          i

SECTION 5.20 Non-Competition; Non-Solicitation.......................................................... 12
SECTION 5.21 Life Insurance ........................................................................................ 12
SECTION 5.22 Ownership .............................................................................................. 12

**ARTICLE 6.** ALLOCATIONS AND DISTRIBUTIONS ............................................... 14

SECTION 6.1    Allocations of Profits and Losses and Gain or Loss On Sale................ 14
SECTION 6.2    Distributions. .......................................................................................... 16
SECTION 6.3    Limitation Upon Distributions. .............................................................. 17
SECTION 6.4    Withholding............................................................................................ 17

**ARTICLE 7.** TRANSFER OF INTEREST...................................................................... 18

SECTION 7.1    Compliance with Securities Laws. ......................................................... 18
SECTION 7.2    Restrictions on Transfer. ........................................................................ 18
SECTION 7.3    Right of First Refusal. ............................................................................ 18
SECTION 7.4    Tag-Along Rights:................................................................................... 20

**ARTICLE 8.** DISSOLUTION AND TERMINATION ................................................... 21

SECTION 8.1    Dissolution.............................................................................................. 21
SECTION 8.2    Distribution of Assets Upon Dissolution................................................ 21
SECTION 8.3    Winding Up. ............................................................................................ 22
SECTION 8.4    Articles of Dissolution............................................................................ 22

**ARTICLE 9.** FINANCIAL STATEMENTS, BOOK RECORDS, TAX RETURNS, ETC. ....... 22

SECTION 9.1    Books of Account..................................................................................... 22
SECTION 9.2    Financial Statements and Reports. ......................................................... 23
SECTION 9.3    Returns and Other Elections.................................................................... 23
SECTION 9.4    Election under Section 754 of the Code. ................................................ 23
SECTION 9.5    Tax Matters Partner. ............................................................................... 23

**ARTICLE 10.** MISCELLANEOUS................................................................................. 24

SECTION 10.1   Notices..................................................................................................... 24
SECTION 10.2   Complete Agreement............................................................................... 25
SECTION 10.3   Amendments............................................................................................ 25
SECTION 10.4   Severability.............................................................................................. 25
SECTION 10.5   Ratification.............................................................................................. 25
SECTION 10.6   Binding Upon Successors........................................................................ 26
SECTION 10.7   Rights of Third Parties. ........................................................................... 26
SECTION 10.8   Governing Law......................................................................................... 26
SECTION 10.9   Captions.................................................................................................... 26
SECTION 10.10  Counterparts. ........................................................................................... 26
SECTION 10.11  Sense and Gender of Words...................................................................... 26

## <u>EXHIBITS</u>

**EXHIBIT A**   MEMBERS' INTERESTS IN THE COMPANY

**EXHIBIT B**   BOARD OF MANAGERS/MANAGEMENT

## OPERATING AGREEMENT
### of
## GUSTAVO CADILE II, LLC

This **OPERATING AGREEMENT** (the "Agreement"), is made and entered into as of the 5th day of November 2009, by and among the undersigned parties (hereinafter, individually or collectively, referred to as a "Member" or "Members").

### W I T N E S S E T H:

WHEREAS, the undersigned parties have caused the Company to be organized as a limited liability company formed pursuant to and in accordance with the New York Limited Liability Company Law (the "Act") on November 2, 2009.

### AGREEMENT:

NOW, THEREFORE, in consideration of ten ($10.00) dollars and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows effective as of the date first written above:

### ARTICLE 1.
### DEFINITIONS

The following terms shall have the following meanings:

"Additional Cash Need" shall have the meaning set forth in Section 4.4(a).

"Additional Cash Need Notice" shall have the meaning set forth in Section 4.4(b).

"Additional Member" means any person or entity who acquires an Interest in the Company pursuant to the terms of this Agreement, other than the parties hereto.

"Adjusted Capital Account" means with respect to any Member, such Member's Capital Account as adjusted by the items described in Sections 1.704-2(g)(1), 1.704-2(i)(5), 1.704-1(b)(2)(ii)(c) and 1.704-1(b)(2)(ii)(d)(4),(5) and (6) of the Treasury Regulations.

"Affiliate" means with respect to any Member (i) any party owning a beneficial interest in a Member, (ii) any spouse, parent, sibling and lineal descendant of a Member or a party described in (i) above, (iii) any trust for the benefit of a party described in (i) or (ii) above, (iv) any corporation, partnership or other entity directly or indirectly controlling, controlled by or under common control with such Member or a party described in (i) or (ii) above, or (v) any officer, director or trustee of any corporation, partnership or other entity directly or indirectly controlling, controlled by or under common control with such Member or a party described in (i) or (ii) above. For purposes hereof, the terms "control", "controlling" or "controlled by" mean the direct or indirect ownership of more than 50% of the voting or beneficial interest in such entity.

973279

"Agreement" means this Operating Agreement as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"Applicable Federal Rate" shall have the meaning set forth in Section 1274(d) of the Code.

"Articles of Organization" of the Company means the Articles of Organization filed with the Secretary of State, State of New York, pursuant to the Act to form the Company, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"Bantam" means Bantam Design Group, LLC, a New York limited liability company.

"Board" shall have the meaning set forth in Section 5.1.

"Capital Account" shall means the accounts maintained for each Member as set forth in Section 4.7.

"Capital Contribution" means any contribution to the capital of the Company in cash or property by a Member, or Members, as the case may be pursuant to the provisions of Section 4.1.

"Cash Needs Loan" shall have the meaning set forth in Section 4.4(b).

"CK" means Caleb D. Koeppel, an individual.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Gustavo Cadile II, LLC, New York limited liability company.

"Contribution Agreement" shall mean that certain contribution agreement, dated as of the date hereof, by and between Gustavo, Bantam and the Company.

"Current Year" shall have the meaning set forth in Section 6.5.

"Employment Agreement" means that certain Employment Agreement, dated as of November 5th, 2009 by and between the Company and GC.

"Excess Distributions" shall have the meaning set forth in Section 6.5.

"Financial Manager" shall have the meaning set forth in Section 5.15.

"GC" means Gustavo Cadile, an individual.

"Gustavo" means Gustavo Cadile Ltd.

2

"Interest" means, with respect to a Member, the entire interest of such Member in the Company, including without limitation its Percentage Interest, and any and all other benefits to which such Member may be entitled under this Agreement and the Act.

"Investment Funds" means an amount equal to two times (2X) the sum of (a) Bantam's initial capital contribution (as set forth in Section 4.2 hereof) and (b) the Preferred Return.

"Legal Fee Contribution" shall have the meaning set forth in Section 4.1 hereof.

"Managers" means the persons or entities elected to act on behalf of the Members as the Board of Managers of the Company.

"Member" means each of the parties that have executed this Agreement and each of the parties that may hereafter become Additional Members pursuant to this Agreement.

"Members Account" means the Capital Account maintained for each Member.

"Member Loan Rate" means an annual interest rate equal to 6%.

"Net Cash Flow" means the gross receipts and other miscellaneous revenue derived from Company operations less all cash operating expenses of the Company including, without limitation, (i) debt service on any Company loans (other than Cash Needs Loans), (ii) taxes and other fees incurred in connection with the operation of the Company and (iii) increases, if any, in reserves established by the Board from time to time for working capital and other purposes.

"Net Profit" and "Net Loss" means the net income (including income exempt from tax) and net loss (including expenditures that can neither be capitalized nor deducted), respectively, of the Company, determined in accordance with the method of accounting used by the Company for federal income tax purposes.

"Offered Interests" shall have the meaning set forth in Section 7.3.

"Offer Notice" shall have the meaning set forth in Section 7.3.

"Percentage Interest" means, with respect to a Member, the percentage interest set forth opposite the name of such Member on Exhibit A attached hereto, as such exhibit may be amended from time to time to reflect the admission of new Members.

"Permanent Disability" shall mean the inability of GC, even with reasonable accommodation, to perform the essential functions of his position hereunder for at least 180 consecutive days or for at least 240 days in any 365 period as a result of a permanent physical or mental disability, as determined in the reasonable opinion of a physician appointed by the

Company or, if GC objects to the findings of such physician, of an independent physician reasonably acceptable to the Company and GC.

"Permitted Transferee" means any member of a Member's immediate family, or a trust, corporation, limited liability company or partnership controlled by a Member or members of a Member's immediate family, or another Person controlling, controlled by or under common control with a Member.

"Person" means any natural person or estate, corporation, partnership, trust, joint venture, limited liability company or other legal entity.

"Preferred Return" means, as of any relevant date, an amount equal to a cumulative return, computed like simple, non-compounding, cumulative interest, at the per annum rate of six percent (6%) accruing on Bantam's Unrecovered Initial Capital Contributions.

"Required Need" means that the Company requires additional funds in order to continue its business and operations as the same are being conducted immediately prior to the Required Need.

"Selling Member" shall have the meaning set forth in Section 7.3.

"Tag-Along Member" shall have the meaning set forth in Section 7.4.

"Tag-Along Notice" shall have the meaning set forth in Section 7.4.

"Tag-Along Purchaser" shall have the meaning set forth in Section 7.4.

"Tag-Along Offer" shall have the meaning set forth in Section 7.4.

"Tag-Along Acceptance Period" shall have the meaning set forth in Section 7.4.

"Tax Distributions" shall have the meaning set forth in Section 6.5.

"Unrecovered Initial Capital Contributions" means, with respect to Bantam, the aggregate amount of initial capital contributions theretofore made by such Member pursuant to Section 4.1 hereof, reduced by the aggregate amount of distributions theretofore made to such Member pursuant to Section 6.2(c); provided, however, that for purposes of calculating the Preferred Return under Section 6.2(b) only, the Unrecovered Initial Capital Contributions shall not include the Legal Fee Contribution.

## ARTICLE 2.
## ORGANIZATION AND TERM

SECTION 2.1   Formation.   (a)  The Members do hereby acknowledge that the Company was formed on November 2, 2009 under the name of Gustavo Cadile II, LLC for the

purpose and scope set forth herein. Pursuant to the provisions of the Act, the formation of the Company was effective upon the filing of the Articles of Organization.

(b)     In order to maintain the Company as a limited liability company under the laws of the State of New York, the Company shall from time to time take appropriate action, including the preparation and filing of such amendments to the Articles of Organization and such other assumed name certificates, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)     a change in the Company name;

(ii)     a correction of a defectively or erroneously executed Articles of Organization;

(iii)     a correction of false or erroneous statements in the Articles of Organization or the desire of the Members to make a change in any statement therein in order that it shall accurately represent the agreement among the Members; or

(iv)     a change in the time for dissolution of the Company as stated in the Articles of Organization and in this Agreement.

SECTION 2.2     Term. The term of the Company shall commence upon filing the Articles of Organization and shall continue in full force and effect until the happening of an event described in Section 9.1 hereof.

SECTION 2.3     Registered Agent and Officer. The Company's registered agent that is a resident in New York is CK at 733 Park Avenue, 3rd Floor, New York, New York 10021. At any time, the Company may designate another registered agent and/or office by amending the Articles of Organization pursuant to the Act.

SECTION 2.4     Principal Place of Business. The principal place of business of the Company shall be 39 W.38th Street, Suite 4W, New York, NY 11018. At any time, the Company may change the location of its principal place of business and may establish additional offices.

SECTION 2.5     Other Instruments. Each Member hereby agrees to execute and deliver to the Company within ten (10) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Company reasonably deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

SECTION 2.6     Scope of Members' Authority. Unless otherwise expressly provided in this Agreement, no Member shall have any authority to act for, or assume any obligations or responsibility on behalf of, the Company or any other Member. The management of the Company shall be reserved to the Managers pursuant to the delegation of duties as specifically provided herein. Nothing contained herein shall constitute the Members as partners

973279                                      5

with one another in any matter (other than for federal income tax purposes) or render any of them liable for the debts or obligations of any other Member.

## ARTICLE 3.
## PURPOSE AND POWERS OF THE COMPANY

SECTION 3.1    Purposes.    The Company may engage in any lawful activity relating to the design, manufacture and sale of women's apparel and to engage in any other business permitted under the Act as unanimously approved by the Members.

SECTION 3.2    Powers of the Company.    In furtherance of the purpose of the Company as set forth in Section 3.1, the Company shall have the power and authority to take in its name all actions necessary, useful or appropriate in the Members' discretion to accomplish its purpose and take all actions necessary, useful or appropriate in connection therewith.

## ARTICLE 4.
## MEMBER'S CAPITAL CONTRIBUTIONS AND INTERESTS

SECTION 4.1    Capital Contributions.    Contemporaneously with the execution hereof, each Member has contributed to the capital of the Company as its initial capital contribution the amount set forth opposite its name on Exhibit A attached hereto.  The Members hereby acknowledge and agree that up to $20,000 of legal fees and expenses incurred by Bantam in connection with the negotiation, preparation and execution of this Agreement, the Contribution Agreement and the Employment Agreement shall be deemed a contribution of capital by Bantam pursuant to this Section 4.1 (the "Legal Fee Contribution").

SECTION 4.2    Interests.    A Member's Interest in the Company shall be represented by the Percentage Interest held by such Member. Each Member (or each Member's predecessor in interest) has heretofore received the percentage interest described for that Member on Exhibit A.

SECTION 4.3    No Requirement of Additional Contributions.    No Member shall be required to make any Capital Contributions to the capital of the Company.  Without limiting the foregoing, no Member shall be required to contribute to the capital of the Company to restore a deficit in the Member's Capital Account existing at any time.

SECTION 4.4    Call for Additional Funds (a) If the Managers shall determine that additional capital is required by the Company (an "Additional Cash Need"), the Company shall use its best efforts to obtain the required funds on commercially reasonable terms from an institutional third party.  If the Company is able to procure debt financing pursuant to the preceding sentence, then prior to the consummation of such financing, Bantam shall have the right to provide the Additional Cash Need on substantially the same terms and conditions as would have been provided by the third party institutional lender.  If Bantam does not elect to provide the Additional Cash Need pursuant to the previous sentence within 10 days of the Company's receipt of an offer for debt financing from the institutional third party, then, subject to the approval of the Financial Manager, the Company may enter into a debt credit facility with

such third party; provided, however, that if the Additional Cash Need is a result of a Required Need, then the consent of the Financial Manager shall not be required to enter into the debt credit facility.

(b)     If the Company is unable to borrow the required funds on commercially reasonable terms and conditions, then the Managers shall submit a notice to each Member advising of the Additional Cash Need and providing the Members with reasonably detailed evidence of the necessity for such Additional Cash Need (the "Additional Cash Need Notice"). Within thirty (30) days of the Additional Cash Need Notice, each Member may, but is not obligated to, fund the Additional Cash Need, via an advance to the Company (a "Cash Needs Loan"). If more than one Member desires to fund the Additional Cash Need then all Members desiring to fund the Additional Cash Need shall advance to the Company their pro rata share of the Additional Cash Need in accordance with their Percentage Interests in the Company vis-à-vis the other contributing Members. Each Member's Percentage Interest shall, under no circumstances, be subject to reduction or dilution hereunder, nor shall any Member be subject to any other penalty or sanction in respect of not making a Cash Needs Loan. Any Cash Needs Loan shall accrue interest at the Member Loan Rate and be repayable in accordance with the provisions of Section 6.1 below.

SECTION 4.5     Withdrawals and Interest.  No Member shall have the right to withdraw from the Company or receive any return or interest on any portion of its Capital Contribution except as otherwise provided herein.

SECTION 4.6     Return of Capital.  No Member shall be entitled to the return of all or any part of its Capital Contribution except in accordance with the provisions of this Agreement.

SECTION 4.7     Capital Accounts.  The Company shall determine and maintain "Capital Accounts" for each member throughout the full term of the Company in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv), as such regulation may be amended from time to time. To the extent not inconsistent with such rules, the following shall apply:

(a)     The Capital Account of each Member shall be credited with (1) an amount equal to such Member's cash contributions and the agreed fair market value of property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code) and (2) such Member's share of the Company's Net Profits (or items thereof). The Capital Account of each Member shall be debited by (1) the amount of cash distributions to such Member and the agreed fair market value of property distributed to such Member (net of liabilities assumed by such Member and liabilities to which such distributed property is subject under Section 752 of the Code) and (2) such Member's share of the Company's Net Losses (or items thereof).

(b)     Upon the transfer of an Interest in the Company after the date of this Agreement, (x) if such transfer does not cause a termination of the Company within the meaning of Section 708(b)(1)(B) of the Code, the Capital Account of the transferor Member that is

973279                                7

attributable to the transferred Interest will be carried over to the transferee Member but, if the Company has an election under Section 754 of the Code in effect, the Capital Account will not be adjusted to reflect any adjustment under Section 743 of the Code, or (y) if such transfer causes a termination of the Company within the meaning of Section 708(b)(1)(B) of the Code, the income tax consequences of the deemed distribution of the property and of the deemed immediate contribution of the property to a new company (which for all other purposes continues to be the Company) shall be governed by the relevant provisions of Subchapter K of Chapter 1 of the Code and the regulations promulgated thereunder, and the initial Capital Accounts of the Members in the new company shall be determined in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(d), (e), (f), (g) and (l), and thereafter in accordance with Section 4.7(a).

(c)     Upon (i) the "liquidation of the Company" (as hereinafter defined), (ii) the "liquidation of a Member's interest in the Company" (as hereinafter defined), (iii) the distribution of more than a de minimis amount of money or property to a Member as consideration for an Interest in the Company, (iv) the contribution of money or property to the Company (other than a de minimis contribution) by a new or existing Member as consideration for an Interest in the Company, (v) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company, or (vi) any transfer causing a termination of the Company for tax purposes within the meaning of Section 708(b)(1)(B) of the Code, then adjustments shall be made to the Members' Capital Accounts in the following manner: All property of the Company which is not sold in connection with such event shall be valued at its then "agreed value". Such "agreed value" shall be used to determine both the amount of gain or loss which would have been recognized by the Company if the property had been sold for its agreed value (subject to any debt secured by the property) at such time, and the amount of Net Cash Flow or net proceeds, as the case may be, which would have been distributable by the Company pursuant to Article 6.2 if the property had been sold at such time for said value, less the amount of any debt secured by the property. The Capital Accounts of the Members shall be adjusted to reflect the deemed allocation of such hypothetical gain or loss in accordance with Section 6.1. The Capital Accounts of the Members (or of a transferee of a Member) shall thereafter be adjusted to reflect "book items" and not tax items in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i).

(d)     For purposes of this Section 4.8, (i) the term "liquidation of the Company" shall mean (A) a termination of the Company effected in accordance with this Agreement, which shall be deemed to occur, for purposes of this Article IV, on the date upon which the Company ceases to be a going concern and is continued in existence solely to wind-up its affairs, or (B) a termination of the Company pursuant to Section 708(b)(1) of the Code; and (ii) the term "liquidation of a Member's interest in the Company" shall mean the termination of the Member's entire interest in the Company effected by a distribution, or a series of distributions, by the Company to the Member.

SECTION 4.8    Liability.    No Member shall be liable under a judgment, decree or order of a court, or in any other manner for a debt, obligation or liability of the Company. Additionally, no Member shall be required to lend any funds to the Company or to pay any contributions, assessments or payments to the Company except the Initial Contributions.

## ARTICLE 5.
## RIGHTS AND DUTIES OF THE MANAGERS AND THE MEMBERS

SECTION 5.1   Management. Subject to the Act and except as provided in Sections 5.2, 5.3 and 5.4 hereof, the powers of the Company shall be exercised by or under the authority of, and the business affairs of the Company shall be managed by the Board of Managers (the "Board"), which shall be responsible for the management and operations of the Company, including all day-to-day operations, and shall have the powers necessary to manage and control the Company, to conduct its business and to implement any decision of the Members adopted pursuant to this Agreement. Unless expressly provided otherwise, any action taken by the Board shall require the consent of at least a majority of the Board. The powers of the Board of Managers under this Section 5.1 shall include, but not be limited to, the following, which shall not be subject to the discretion of the Financial Manager pursuant to Sections 5.2 or 5.15:

    (a)   enter into a real estate lease or long-term equipment lease with an annual payment in excess of $10,000;

    (b)   enter into any factoring arrangement with a bank, other lending institution, a Member or otherwise; and

    (c)   hire or engage any employee or independent contractor with an annual salary or payments in excess of $100,000 per year.

SECTION 5.2   Certain Powers of Bantam. Notwithstanding Section 5.1 hereof, Bantam is hereby delegated all rights and responsibilities associated with all aspects of the Company's finances and shall take all action on behalf of the Company relating to the foregoing in its sole and absolute discretion (except as otherwise set forth herein); provided, however, that neither Bantam nor the Financial Manager shall have the right to amend or otherwise act in contravention the provisions of Section 6.2 hereof; and provided, further, that prior to the one year anniversary of this Agreement, Bantam shall not expend, and shall not permit any of the Managers to expend, in excess of $20,000 of Company funds on office infrastructure, which shall include phones and phone services, computers, furniture, office painting and other such office related services and improvements. Bantam hereby covenants and agrees to perform such duties and obligations with a reasonable standard of care and competence. Bantam shall elect a Financial Manager, as more fully described in Section 5.15 hereof, to act as supervisor of the Company's financial matters. Bantam and/or the Financial Manager, as appropriate, shall use its reasonable efforts to consult with GC and/or John Coppola prior to taking any action for or on behalf of the Company and in all events shall inform (or shall cause the Financial Manager to inform) the Board of Directors, in writing (which may be done via email), as soon as reasonably practicable following any action taken by the Financial Manager of any such action taken. Notwithstanding the foregoing, upon receipt by Bantam of the Investment Funds and payment in full of any and all Additional Cash Needs funded by Bantam or its affiliates, this Section 5.2 shall be null and void and any and all management powers granted to Bantam as set forth in this Section 5.2, including, without limitation, the right to elect the Financial Manager, shall be governed in accordance with Sections 5.1 and 5.4 hereof.

SECTION 5.3   Certain Powers of GC.  Notwithstanding Section 5.1 hereof, GC is hereby delegated all rights and responsibilities associated with all aspects of the creative design of the Company's products and website and shall take all action on behalf of the Company relating to the foregoing in its sole and absolute discretion (except as otherwise set forth herein). GC hereby covenants and agrees to perform such duties and obligations with a reasonable standard of care and competence.

SECTION 5.4   Certain Powers of Members.  The consent of the holders of at least 75% of the Interests shall be required in order for the Managers to take the following actions on behalf of the Company:

   (a)   borrow money from banks, other lending institutions, a Member, or otherwise (including any financing or refinancing) in excess of $500,000 or pledge or otherwise encumber the assets of the Company;

   (b)   except as specifically set forth in the Employment Agreement, change or modify the compensation paid to GC as set forth in the Employment Agreement;

   (c)   voluntarily dissolve or terminate the Company or to file in the name, or on behalf, of the Company any petition for relief in bankruptcy under any federal bankruptcy laws or debtor relief laws or any other debtor relief laws of any jurisdiction;

   (d)   confess a judgment against the Company, settle, compromise or release, discharge or pay any claim, demand or debt including claims for insurance in excess of $100,000;

   (e)   except as otherwise provided in Article VII, issue any Percentage Interests, dilute the existing Percentage Interests or admit new Members;

   (f)   except as otherwise provided in Section 4.4 hereof, lend any Company funds or other assets to any person in any amount;

   (g)   change the Company's jurisdiction of formation;

   (h)   change the nature or character of the business of the Company;

   (i)   change the name of the Company;

   (j)   except as otherwise set forth herein, amend the Articles of Organization;

   (k)   sell all or substantially all of the assets of the Company;

   (l)    approve a merger or consolidation of the Company with or into any other limited liability company, corporation, partnership or other entity; and

(m)   except as expressly stated herein, enter into any transactions with a Member or the principals, Affiliates and/or members of any of the Members.

SECTION 5.5   Number and Election of Managers.  The Board of Managers of the Company shall consist of four (4) persons (the "Managers"), two of whom shall be appointed by Gustavo and two of whom shall be appointed by Bantam.  The initial Board of Managers shall be named on Exhibit B hereto.  Members shall be entitled to appoint representatives to serve on the Board (the "Representative") in accordance with the terms set forth Exhibit B hereto.  Any Manager may resign at any time upon notice to the Company or may be removed, with or without cause, by the Member having appointed such Representative in accordance with this action.

SECTION 5.6   Regular Meetings.  Regular meetings of the Board for the purpose of transacting business as may come before the meeting may be called by the President.  Each regular meeting shall be held on two (2) days written notice, at such time and place as shall be from time to time determined by the Board or by the President who is also a member of the Board.  Written notice for any such meeting shall state the place, date and hour of the meeting and shall be delivered either personally, by first class mail, facsimile or other electronic transmission.

SECTION 5.7   Special Meetings.  Special meetings of the Board may be called by the President or Chief Financial Officer at the request in writing of at least two (2) Managers.  Written notice for any such meeting shall state the place, date and hour of the meeting and shall be delivered either personally, by first class mail, facsimile or other electronic transmission.'

SECTION 5.8   Place of Meeting; Waiver of Notice.  Meetings of the Board shall be held at such place as shall be designated in the notice of meeting if notice is required.  Notice of any meeting, if required, need not be given to any Manager who signs a waiver of notice before or after the meeting.  The attendance of any Manager at any meeting without protesting prior to the conclusion of such meeting the lack of notice thereof shall constitute a waiver of notice by such Manager.

SECTION 5.9   Action Without a Meeting.  Any action required or permitted to be taken by the Board or by a committee thereof may be taken without a meeting if, prior to such action, all of the members of the Board consent in writing to a resolution authorizing the action.  Such written consents may be executed in counterparts, and shall be filed with the minutes of the Company.

SECTION 5.10  Telephonic Attendance at Meeting.  Any or all directors may participate in a meeting of the Board or a committee of the Board by means of conference telephone or any means of communication by which all persons participating in the meeting are able to hear each other.

SECTION 5.11  Vacancies.  Any Representative on the Board of Managers may be removed for any reason by the Member who appointed such Representative.  Upon such

removal, the party that appointed the removed Manager shall be entitled to appoint a replacement.

SECTION 5.12  Chairman of the Board.  A Chairman of the Board of Directors may be elected by the Board from among its members.

SECTION 5.13  Compensation of Managers.  Managers shall be entitled to reimbursement from the Company for all reasonable direct out-of-pocket expenses incurred in connection with their service on the Board, which shall include travel expenses for attending Board meetings and other travel expenses related to the Company or the activities of the Board; provided, however, that reimbursement for such expenses shall be subject to the Company's written policies with respect to travel expenses, if any.  Except for the foregoing, the Managers shall not be entitled to any compensation from the Company for Board service.

SECTION 5.15  Officers.  The Company's officers shall be a President and a Chief Financial Officer and, if desired, one or more Vice Presidents, as well as Secretaries, Assistant Secretaries and Assistant Treasurers.  The officers shall be elected by the Board at its regular meeting following the annual meeting of the Members or at any other meeting of the Board. The initial officers of the Company are as follows:

> Gustavo Cadile – President
> Wayne Sellers – Chief Financial Officer

The officers of the Company shall hold office until their successors are chosen and qualify. The Board may remove any officer at any time, without the necessity of specifying any cause therefor and without any prior notice of such action to the person removed; provided, however that GC shall not be removed as President so long as he is employed by the Company.

SECTION 5.15  Financial Manager and other Consulting Services.  Subject to Section 5.2 hereof, Bantam shall appoint, in its sole discretion, one or more persons to serve as the Financial Manager(s) of the Company.  KC may serve as one of, or the sole, appointed Financial Manager.  The Financial Manager may be removed and replaced in the sole discretion of Bantam.  The Financial Manager shall have a supervisory role over all the financial matters of the Company.  The Financial Manger shall not be entitled to any compensation from the Company for any service as the Financial Manager.  Further, Bantam (or the Financial Manager, as Bantam shall determine) shall consult with the Company, in Bantam's reasonable discretion, on other managerial and administrative matters.  The Financial Manager shall, subject to Board approval, hire or engage employees or consultants to perform such bookkeeping, managerial and other administrative services on reasonable terms and for reasonable compensation to be paid by the Company.  In addition to the foregoing, Bantam shall use commercially reasonable efforts to assist in the expansion of the Company's business, its client base and its distribution chain as well as the development of new resources; provided, however, that Bantam shall not be required to expend its own funds in providing the foregoing.

SECTION 5.16  Vacancies.  Any vacancy in the Office of the President or any other office shall be filled by the Board.

SECTION 5.17 No Management Powers of the Members. The Members in such capacity shall have no voice or participation in the management of the Company business, and no power to bind the Company or to act on behalf of the Company in any manner whatsoever, except as specifically provided in this Agreement or by applicable law.

SECTION 5.18 Bank Accounts. The Company shall establish and maintain accounts in financial institutions (including, without limitation, national or state banks, trust companies or savings and loan institutions) in such amounts as the Board may deem necessary from time to time. All accounts established and maintained by the Company shall be under the sole management and control of the Financial Manager; provided, however, there shall be one operating account established and maintained by the Company from which GC shall be permitted to make withdrawals of $5,000 per month. Notwithstanding the foregoing, any withdrawal (whether by check or wire) to be made by the Company outside of the Company's ordinary course of business shall require the signature of (a) the Financial Manager and (b) Gustavo or one of Gustavo's appointees to the Board.

SECTION 5.19 Indemnity. The Company shall indemnify and hold harmless the Members, Managers, the Financial Manager and their respective directors, officers, agents and employees (each, an "Indemnified Party") from any loss or damage incurred by them (including reasonable attorney's fees and costs) by reason of any acts performed or omitted by them for or on behalf of the Company, unless they committed such acts in bad faith or such acts were the results of active and deliberate dishonesty and were material to the cause of action so adjudicated or such Indemnified Party shall have personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

SECTION 5.20 Non-Competition; Non-Solicitation. Each of Gustavo and GC hereby acknowledges and agrees that during the course of GC's employment with the Company pursuant to the Employment Agreement and during the three (3) year period following termination of his employment with the Company pursuant to the terms of the Employment Agreement (the "Restricted Period"), neither Gustavo, GC, nor any affiliate thereof, shall (a) directly or indirectly enter into, start or conduct any business if the same is competitive in any way with the primary business of the Company or other businesses which the Company has planned to enter into within six (6) months of commencement of the Restricted Period as evidenced by reasonable written evidence (which shall include emails) of such plans or (b) directly or indirectly solicit or hire any employee of the Company or any of its Affiliates who is an employee of the Company or any of its Affiliates as of the date hereof (or who is hereafter hired by the Company or any of its Affiliates) and who has devoted any material portion of his or her time to the business of the Company or its Affiliates. Notwithstanding the foregoing, the Restricted Period shall be reduced to two (2) years following termination of employment if GC's employment with the Company is terminated more than five (5) years after the date hereof. The Members hereby acknowledge that, as of the date hereof, the Company's primary business is the design and/or sale of women's dresses.

SECTION 5.21 Life Insurance. The Company shall maintain key person life insurance on the life of GC in a the face amount of not less than $1,000,000. The Company shall be the owner of such life insurance policy, shall pay the premiums thereon and shall be the sole beneficiary thereof. GC shall cooperate with the Company in all reasonable respects to

enable the Company to purchase insurance on his life, including submitting to physical examinations and providing information and data required by insurance companies for the purpose of obtaining the insurance.

SECTION 5.22    Ownership. GC and JC hereby acknowledge and agree that Gustavo is owned 48% by GC, 48% by JC and 2% by each of two other individuals. Each of GC and JC, jointly and severally, covenant and agree that as of the date hereof and at all times while Gustavo is a Member of the Company, each of GC and JC will own and control their respective percentages of Gustavo as set forth in this Section 5.22.

## ARTICLE 6.
## ALLOCATIONS AND DISTRIBUTIONS

SECTION 6.1    Allocations of Profits and Losses and Gain or Loss On Sale.

(a)    Allocation of Net Profits. Subject to Section 6.1(c), Net Profits for a fiscal year shall (except as otherwise required by Section 704(b) of the Code or the Treasury Regulations thereunder) be allocated among the Members as follows:

(i)    First, to Bantam until the aggregate amount of Net Profits allocated to Bantam pursuant to this Section 6.1(a)(i) as of the end of such fiscal year (i.e., the aggregate amount for the fiscal year in question and all prior fiscal years) equals the aggregate amount of Preferred Return accrued by Bantam;

(ii)    Second, to Gustavo until the aggregate amount of Net Profits allocated to Gustavo pursuant to this Section 6.1(a)(ii) as of the end of such fiscal year (i.e., the aggregate amount for the fiscal year in question and all prior fiscal years) equals the aggregate amount of distributions received by Gustavo pursuant to Section 6.2(c);

(iii)    Third, to the Members in the same ratio in which Net Losses have been allocated to each Member pursuant to Section 6.1(b)(iv) until the aggregate amount of Net Profits allocated to each Member pursuant to this Section 6.1(a)(iii) as of the end of such fiscal year (i.e., the aggregate amount for the fiscal year in question and all prior fiscal years) equals the aggregate amount of Net Losses allocated to each Member pursuant to Section 6.1(b)(iv);

(iv)    Fourth, to the Members in the same ratio in which Net Losses have been allocated to each Member pursuant to Section 6.1(b)(iii) until the aggregate amount of Net Profits allocated to each Member pursuant to this Section 6.1(a)(iv) as of the end of such fiscal year (i.e., the aggregate amount for the fiscal year in question and all prior fiscal years) equals the aggregate amount of Net Losses allocated to each Member pursuant to Section 6.1(b)(iii); and

(v)    Thereafter, the balance, if any, to the Members in accordance with their Percentage Interests.

(b)     Allocation of Net Losses.  Subject to Section 6.1(c), Net Losses for a fiscal year shall (except as otherwise required by Section 704(b) of the Code or the Treasury Regulations thereunder) be allocated among the Members as follows:

(i)     First, to those Members who were previously allocated Net Profits pursuant to Section 6.1(a)(v), in proportion to the amounts so allocated up to an amount equal to the excess, if any, of the aggregate Net Profits allocated under Section 6.1(a)(v) over the aggregate distributions made to the Members under Section 6.2(d) (and the aggregate distributions made to the Members in respect of Section 6.2(d) pursuant to Section 6.5) as of the end of such fiscal year;

(ii)     Second, to those Members who were previously allocated Net Profits pursuant to Section 6.1(a)(i), in proportion to the amounts so allocated up to an amount equal to the excess, if any, of the aggregate Net Profits allocated under Section 6.1(a)(i) over the aggregate distributions made to the Members under Section 6.2(b) (and the aggregate distributions made to the Members in respect of Section 6.2(b) pursuant to Section 6.5) as of the end of such fiscal year;

(iii)     Third, to the Members pro rata in proportion to the positive balances in their Adjusted Capital Accounts; and

(iv)     Thereafter, the balance, if any, to the Members in accordance with their Percentage Interests.

(c)     Special Rules Regarding Allocations.

Notwithstanding the foregoing provisions of Section 6.1:

(i)     In accordance with Sections 704(b) and (c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company (including all or part of any deemed capital contribution under section 708 of the Code) shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its agreed value.  In the event that Capital Accounts are ever adjusted pursuant to Treasury Regulation section 1.704-1(b)(2) to reflect the fair market value of any Company property, subsequent allocations of income, gain, loss and deduction with respect to such asset shall, solely for tax purposes, take account of any variation between the adjusted basis of such asset and its value as adjusted in the same manner as required under section 704(c) of the Code and the Treasury Regulations thereunder.

(ii)     At no time shall any allocation of losses be made to a Member if such allocation would cause the deficit in the Member's Capital Account, if any, to exceed his "Company minimum gain" or "Member nonrecourse debt minimum gain" (as defined in Treasury Regulation Sections 1.704-2(b)(2) and (g)(1) and (i)(2) and (5), respectively), and any losses not allocated to a Member by reason of this clause (ii) shall be allocated to each Member whose deficit, if any, in the Member's Capital Account of such Member shall not exceed his allocable share of such minimum gain by reason of such allocation, or to the Members who bear

the economic risk of loss attributable to such losses, and subsequent profits shall be allocated to Members to the extent losses have previously been allocated to them pursuant to this Subsection 6.1(e)(ii).

(iii)     Nonrecourse deductions, as defined in Treasury Regulations Section 1.704-2(b), shall be allocated among the Members in proportion to their Interests. Member nonrecourse deductions shall be allocated among the Members in the proportion to which they share the economic risk of loss with respect to the Member nonrecourse debt to which such deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(iv)     If there is a net decrease in the Company minimum gain (within the meaning of Treasury Regulation Section 1.704-2(g)(2)) for a Company taxable year, then, before any allocations are made for such year other than those pursuant to clause (ii) above, each Member with a share of the Company minimum gain at the beginning of the year shall be allocated items of Company income and gain for such year (and, if necessary for subsequent years) in an amount equal to each Member's share of the net decrease in Company minimum gain as determined in accordance with Treasury Regulation Section 1.704-2(f) in a manner so as to satisfy the requirements of said Treasury Regulation.

(v)     If, during any taxable year, there is a net decrease in Member non-recourse debt minimum gain, then, before any other allocations are made for such year other than those pursuant to clause (ii) above, each Member with a share of the Member nonrecourse debt minimum gain at the beginning of the year shall be allocated items of Company income and gain for such year (and, if necessary, for subsequent years) in an amount equal to each Member's share of the net decrease in Member nonrecourse debt minimum gain as determined in accordance with Treasury Regulation Section 1.704-2(i)(4) in a manner so as to satisfy the requirements of said Treasury Regulation.

(vi)     If, during any taxable year, a Member unexpectedly receives, or, as of the end of such year, is reasonably expected to receive, an adjustment, allocation or distribution described in paragraph (4), (5) or (6) of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), and if such adjustment, allocation or distribution would cause at the end of the taxable year a deficit balance in such Member's Adjusted Capital Account, then such Member shall be allocated items of income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount and in a manner sufficient to eliminate such excess balance as quickly as possible before any other allocation is made for such year, other than pursuant to clause (ii) and (iii) above, so as to satisfy the requirements of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) (qualified income offset).

(vii)     In the event any Member has a deficit balance in his Adjusted Capital Account at the end of the fiscal year, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible.

SECTION 6.2     Distributions.  The Board shall distribute Net Cash Flow in the following order of priority and at such times (but in no event less than annually) and in such amounts as the Board shall determine:

(a)     First, to pay all principal and interest due and owing on account of any Cash Needs Loans, with distributions being applied first to accrued interest, then to principal; and

(b)     Second, 100% to Bantam in an amount to satisfy the Preferred Return until the amount distributed pursuant to this Section 6.2(b) for all Fiscal Years is equal to the aggregate accrued but unpaid Preferred Return;

(c)     Third, 80% to Bantam and 20% to Gustavo, until such time as Bantam has received an amount equal to its Unrecovered Initial Capital Contributions; and

(d)     Fourth, to the Members, *pro rata*, in accordance with their respective Percentage Interests.

SECTION 6.3   Limitation Upon Distributions.   No distribution shall be declared and paid if, after the distribution is made the sum of the Company's total assets would be less than the sum of its total liabilities.

SECTION 6.4   Withholding.   The Company is hereby authorized to, and shall, comply with any and all withholding obligations to which it is subject. In the event the Company is required to deduct and withhold, pursuant to the Code or any other federal, state or local law, rule or regulation which is currently in effect or which may be promulgated hereafter ("Applicable Law"), any amount from an actual distribution to a Member, the amount so deducted and withheld from such distribution shall, for all purposes of this Agreement, be treated as a distribution to such Member of the same type as the distribution giving rise to the obligation. In the event Applicable Law requires the Company to pay or withhold any amount on behalf of a Member (including any federal, state or local taxes) measured by a Member's distributive share of the Company's Net Profit, gain or any other Company item, other than any amount required to be deducted and withheld from actual distributions to a Member, then the payment or withholding of any such amount shall be considered a loan ("Tax Loan") by the Company to such Member (the "Borrowing Member"). The Borrowing Member shall repay any such Tax Loan within 30 days after the other Member delivers a written demand therefor, together with interest at an annual rate equal to two percent (2%) per annum in excess of the rate announced from time to time in the Wall Street Journal as the "prime rate" from the date such loan was made until the date of the repayment thereof. In addition to any other rights of the Company to enforce its entitlement to receive payment of the Tax Loan, plus any accrued interest thereon, the Company may deduct from any distribution to be made to a Borrowing Member an amount not greater than the outstanding balance of any Tax Loan, plus any accrued interest thereon, as a payment in total or partial satisfaction thereof.

SECTION 6.5   Tax Distributions.   Notwithstanding anything in this Agreement to the contrary, to the extent the Company has not previously made distributions to its Members equal to the Tax Distribution (as defined below), prior to any other distributions set forth in Section 6.2 hereof, the Board shall distribute to each Member, within ninety (90) days following the end of the Company's taxable year (the "Current Year"), an amount in cash equal to (a "Tax Distribution"), when combined with all other distributions to such Member on account of the

Current Year, the product of (x) the percentage equal to the highest combined federal, state and local marginal income tax rate to which any Member (or any other person which, directly or indirectly, owns an interest in any Member and which is required to pay tax on any portion of any Member's distributive share of the Company's net taxable income for such taxable year) is subject for such Current Year (and, for this purpose, taking into account all deductions for income taxes that such Member or other Person would be entitled to claim for such taxable year in respect of the Company's net taxable income), and (y) the amount of net taxable income allocated to such Member in the Current Year. A distribution to any Member pursuant to this Section 6.5 shall reduce in the same order of priority and on a dollar for dollar basis until fully recovered any distribution to which a Member is otherwise entitled under Section 6.2 above (other than Section 6.2(a)). If, upon dissolution or termination of the Company or the withdrawal of a Member as a Member of the Company, the aggregate Tax Distribution received by any Member pursuant to this Section 6.5, together with the aggregate amount of distributions actually received by such Member pursuant to Section 6.2, exceeds the aggregate amount of distributions that such Member is otherwise entitled to receive pursuant to Section 6.2 (any such excess, the "Excess Distribution"), such Member shall pay such Excess Distribution amount to the Company (without interest) at the time of such dissolution, termination or withdrawal and the Company shall re-distribute such Excess Distribution to the remaining Members.

## ARTICLE 7.
## TRANSFER OF INTEREST

SECTION 7.1   Compliance with Securities Laws.  No Interest has been registered under the Securities Act of 1933, as amended, or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Interest, except upon compliance with the applicable federal and state securities laws. The Board shall have no obligation to register any Interest under the Securities Act of 1933, as amended, or under any applicable state securities laws, or to make any exemption therefrom available to any Member.

SECTION 7.2   Restrictions on Transfer.   Except to a Permitted Transferee, or as is otherwise expressly permitted by this Article VII, no Member may pledge, sell, assign, transfer or otherwise dispose of its Interest (a "Transfer"), whether voluntarily, involuntarily or by operation of law, and whether by inter vivos or testamentary transfer, without the prior written consent of the Board, which may be unreasonably withheld, and any attempt to do so shall be null and void. Further, any transfer (except to a Permitted Transferee or as otherwise expressly provided in this Article VII) shall not give the transferee the right to be admitted as a Substitute Member. Unless the Board agrees otherwise, no assignment or transfer of an Interest by any Member shall relieve the transferring Member of any liability to the Company or the other Member that arose prior to the assignment of transfer.

SECTION 7.3  Right of First Refusal. (a)  Except to a Permitted Transferee, if either Member proposes to Transfer Percentage Interests in response to a bona fide offer from a third party (such Member is hereinafter referred to as the "Selling Member"), the Selling Member shall first send notice to the other Member of its intention to make such Transfer before

18

selling, transferring or otherwise disposing of such interest (the "Offered Interests") to any other person, corporation or other entity (the "Offer Notice"). Such Offer Notice shall be in writing, shall be given to every other Member, and shall set forth the Offered Interests, the purchase price at which the Offered Interests are offered, the date on which the closing is to take place (which date shall be not less than thirty nor more than sixty days after the delivery of the offer), the location at which the closing is to take place, and all other material terms and conditions of the sale, transfer or other disposition.

(b) Within fifteen days after the delivery of the Offer Notice, the other Member shall deliver to the Selling Member a written notice either accepting or rejecting the offer. Failure to deliver said notice within said fifteen days conclusively shall be deemed a rejection of the offer.

(c) If the other Member elects to accept the offer, then the closing of title shall be held in accordance with the offer and the Selling Member shall deliver to the other Member who has accepted the offer an assignment of the interest being sold by the Selling Member, and said other Member shall pay the purchase price prescribed in the offer.

(d) If the other Member does not accepts the offer, or if the Member accepts the offer but defaults in its obligation to purchase the interest, then the Selling Member within 90 days after the delivery of the offer may sell such interest to any other person or entity (subject to Sections 7.3(g) and (h) below) at a purchase price which is not less than the purchase price prescribed in the offer and upon terms and conditions which are substantially the same as the terms and conditions set forth in the offer, provided all other applicable requirements of this Agreement are complied with. An assignment of such interest to a person or entity who is not a Member of the Company shall only entitle such person or entity to the allocations and distributions to which the assigned interest is entitled, unless such person or entity applies for admission to the Company and is admitted to the Company as a Member in accordance with this Agreement.

(e) If the Selling Member does not sell such interest within said 90 days, then the Selling Member may not thereafter sell such interest without again offering such interest to the other Member in accordance with this Section 7.3.

(f) (i) If CK, directly or indirectly, proposes to pledge, sell, assign, transfer or otherwise dispose of his interest in Bantam, whether by way of a sale, merger or otherwise, the effect of which would result in CK (or a Permitted Transferee) not being the controlling shareholder (or member) of Bantam, then such sale, assignment, transfer or other disposition shall be considered a Transfer of Percentage Interests pursuant to this Section 7.3, Bantam shall be deemed to be a Selling Member and Gustavo shall have a right a right of first refusal with respect to the purchase of such interests in Bantam as set forth in this Section 7.3.

(ii) If GC (or John Coppola), directly or indirectly, proposes to pledge, sell, assign, transfer or otherwise dispose of his interest in Gustavo, whether by way of a sale, merger or otherwise, the effect of which would result in GC (or a Permitted Transferee) not being the controlling shareholder (or member) of Gustavo, then such sale, assignment, transfer or other disposition shall be considered a Transfer of Percentage Interests pursuant to this Section 7.3,

Gustavo shall be deemed to be a Selling Member the other Member shall be deemed to be a Tag-Along Member and shall have the rights afforded to the Tag-Along Member pursuant to Section 7.4(a) and (b) hereof.

(g)     Notwithstanding anything contained in this Article VII, on or before the five (5) year anniversary of the date hereof, Bantam shall not be permitted to Transfer Percentage Interests to any person or entity who is engaged primarily in same line of business(es) as the line of business(es) being conducted by the Company as of the date of the proposed Transfer. The prohibition contained in this Section 7.3(g) shall be construed narrowly by the Members so as only to prohibit Bantam from Transferring Percentage Interests to another person or entity that (i) directly competes with the Company.

(h)     Subject to the provision of this Section 7.3, Bantam shall be permitted to, without the consent of the Board, Transfer Percentage Interest to any person or entity provided that such Transfer does not include a transfer of Bantam's management rights hereunder, including, without limitation, those management rights set forth in Sections 5.1 and 5.2. In the event of a Transfer pursuant to the preceding sentence, all management rights granted to Bantam hereunder, including without limitation, those rights set forth in Sections 5.1 and 5.2 hereof, shall vest solely in Gustavo. In the event Bantam elects to Transfer Percentage Interests in connection with the transfer of its management rights hereunder, Bantam must first obtain the consent of the Board, which consent may not be unreasonably withheld.

SECTION 7.4 Tag-Along Rights. Subject to Section 7.3 hereof, if Gustavo proposes to Transfer Percentage Interests to another Person or group of related Persons (other than a Permitted Transferee) in any transaction or series of related transactions, Gustavo, as the Selling Member, may consummate such sale provided:(a)   Such Selling Member shall first deliver to the other Member (the "Tag-Along Member") a written notice (the "Tag Along Notice"), which shall specifically identify the proposed transferee (the "Tag Along Purchaser"), the amount of Percentage Interests proposed to be sold, the purchase price therefor, and a summary of the other material terms and conditions of the proposed sale, and shall contain an offer (the "Tag Along Offer") by the Tag Along Purchaser to the Tag-Along Member, which by its terms shall remain open and irrevocable for a period of fifteen (15) days from the date it is delivered (the "Tag Along Acceptance Period") (and, to the extent the Tag Along Offer is accepted during Tag Along Acceptance Period, until the closing of the sale contemplated by the Tag Along Offer), to purchase the pro rata portion of the Percentage Interests of the Tag-Along Member at the same purchase price and upon the same terms and conditions as the Selling Member. A copy of the Tag Along Sale Notice shall promptly be sent to the Company. Notice of a Tag-Along Member's intention to accept a Tag Along Offer, in whole or in part, shall be evidenced by a writing signed by the Tag-Along Member and delivered to the Tag Along Purchaser, the Selling Member and the Company prior to the end of the Tag Along Acceptance Period, setting forth the amount of Percentage Interests that the Tag-Along Member elects to sell. If effective acceptance by the Tag Along Member has been received pursuant to this paragraph (a), then the Selling Member shall not consummate such sale of Percentage Interests without permitting participation of the Tag-Along Member.

(b)     The delivery of certificates or other instruments, if any, evidencing such Percentage Interests duly endorsed for transfer shall be made on such date against payment of the purchase price for such Percentage Interests.

(c)     If GC proposes to pledge, sell, assign, transfer or otherwise dispose of his interest in Gustavo, whether by way of a sale, merger or otherwise, the effect of which would result in GC (or a Permitted Transferee) not being the controlling shareholder (or member) of Gustavo, then such sale, assignment, transfer or other disposition shall be considered a Transfer of Percentage Interests pursuant to this Section 7.4, Gustavo shall be deemed to be a Selling Member the other Member shall be deemed to be a Tag-Along Member and shall have the rights afforded to the Tag-Along Member pursuant to Section 7.4(a) and (b) hereof.

### ARTICLE 8.
### DISSOLUTION AND TERMINATION

SECTION 8.1    Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

(a)     the written consent of the holders holding at least 75% of the outstanding Interests;

(b)     the entry of a decree of judicial dissolution under Section 702 of the Act;

(c)     upon the sale of all or substantially all of the assets of the Company; or

(d)     in the sole discretion of Bantam upon the death or Permanent Disability of GC.

Except as provided in Section 8.1(d), notwithstanding anything contained herein to the contrary, the bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of a Member shall not result in the dissolution of the Company.

SECTION 8.2    Distribution of Assets Upon Dissolution. In settling accounts after dissolution, the liabilities of the Company shall be entitled to payment in the following order:

(a)     those to creditors including Members who are creditors to the extent otherwise permitted by law, other than liabilities for distributions to Members;

(b)     reasonable reserves as determined by the Members;

(c)     to Bantam in an amount equal to its accrued and unpaid Preferred Return;

(d)     to the Members in an amount equal to, and in proportion to, their Unrecovered Initial Capital Contributions; and

(e)     to the Members in accordance with their Percentage Interests.

Notwithstanding anything contained in this Section 8.2, if assets are being distributed pursuant to Sections 8.2(c) or (d), prior to such distribution, the Company shall engage an independent intellectual property valuation appraiser to conduct a valuation of the name "Gustavo Cadile" and any and all derivatives thereof used by the Company in its business (the "Name"). Upon a determination of valuation thereof, such intellectual property shall be distributed to Gustavo and the amount of the valuation therefore shall be applied to any distributions made to Gustavo pursuant to this Section 8.2; provided, however, that if the value of the Company's assets other than the Name does not permit Bantam to receive its proportionate share of distributions pursuant to Section 8.2 upon distribution of the Name to Gustavo, then Gustavo shall have the right purchase the Name for an amount equal to its valuation and have the proceeds therefrom be distributed in accordance with Section 8.2. Notwithstanding the foregoing, in the event distributions are being made due to a dissolution pursuant to Section 8.1(c) and the Name is being transferred in connection with a sale of the Company's assets, then Gustavo shall have no right to retain, reclaim or purchase from the Company such intellectual property.

SECTION 8.3  Winding Up.  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company's assets remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of each Member, such Member shall have no recourse against any other Member. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Board, who is hereby authorized to take all actions necessary to accomplish such distribution including, without limitation, selling any Company assets the Board deems necessary or appropriate to sell.

SECTION 8.4  Articles of Dissolution.  Within ninety (90) days following the dissolution and commencement of winding up of the Company, or at any time there are no Members, Articles of Dissolution shall be executed and filed pursuant to Section 705 of the Act, and shall contain the information required by the Act.

## ARTICLE 9.
## FINANCIAL STATEMENTS, BOOK RECORDS, TAX RETURNS, ETC.

SECTION 9.1  Books of Account.  The Board, at the expense of the Company, shall maintain, at the principal office of the Company, complete books of account, in which there shall be entered, fully and accurately, every transaction of the Company and shall include the following:

(a)  A current list of the full name and last known business address of each Member;

(b)  A copy of the Articles of Organization and Operating Agreement of the Company and all amendments thereto;

(c)  Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years; and

(d)     Copies of the Company's currently effective written Agreement and copies of any financial statements of the Company for the three most recent years. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept on a tax accounting basis applied in a consistent manner. All determinations by the TMP (defined in Section 9.5 below) with respect to the treatment of any item or its allocation for Federal, state, or local tax purposes shall be binding upon all of the Members. Any Member shall have the right, from time to time, at its own expense, to cause its accountants and representatives to inspect and copy the records referred to in paragraphs (a) through (c) above and any financial statements maintained by the Company for its three most recent years, as well as such other information regarding the affairs of the Company as, in the reasonable determination of the Board, is just and reasonable. The Board, upon not less than five business days' written notice, shall make such records available for such inspection at reasonable hours during business days. Any Member exercising its right of inspection shall reimburse the Company for its reasonable costs and expenses, if any, incurred in connection therewith.

SECTION 9.2    Financial Statements and Reports. The Board shall send to each Member after the end of each taxable year such information as is necessary for each Member to complete Federal and state income tax or information returns. Upon the written request of a Member, the Company shall provide to such Member a complete copy of the Company's federal income tax return for the immediately preceding fiscal year.

SECTION 9.3    Returns and Other Elections. The Board shall at the expense of the Company cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

SECTION 9.4    Election under Section 754 of the Code. In the event of any transaction described in Section 743(b) of the Code and permitted by the provisions of this Agreement, the Company shall, upon the timely written request of the person succeeding to a Company Interest in such transaction, make the election provided for in Section 754 of the Code or a similar provision enacted in lieu thereof, to adjust the basis of the Company's assets. The Member requesting said election shall pay all costs and expenses incurred by the Company in connection therewith.

SECTION 9.5    Tax Matters Partner. Bantam is hereby designated the Tax Matters Partner (the "TMP") of the Company for purposes of Chapter 63 of the Code and the Treasury Regulations thereunder.

(a)     Each Member shall furnish the TMP with such information as the TMP may reasonably request to permit it to provide the Internal Revenue Service with sufficient information to allow proper notice to the parties in accordance with Section 6223 of the Code.

(b)     No Member shall file, pursuant to Section 6227 of the Code, a request for an administrative adjustment of company items for any Company taxable year without first noti-

fying the other Members. If the other Members agree with the requested adjustment, the TMP shall file the request for administrative adjustment on behalf of the Company. If the Members do not reach agreement within 30 days or within the period required to timely file the request for administrative adjustment, if such period is shorter, any Member may file a request for administrative adjustment on its own behalf. If, under Section 6227 of the Code, a request for administrative adjustment which is to be made by the TMP must be filed on behalf of the Company, the TMP shall also file such a request on behalf of the Company under the circumstances set forth in the preceding sentence.

(c) If any Member intends to file a petition under Section 6226 or 6228 of the Code with respect to any company item or other tax matter involving the Company, the Member so intending shall notify the other Members of such intention and the nature of the contemplated proceeding. Such notice shall be given in a reasonable time to allow the other Members to participate in the choosing of the forum in which such petition will be filed. If the Members do not agree on the appropriate forum, the petition shall be filed with the United States Tax Court. If any Member intends to seek review of any court decision rendered as a result of the proceeding instituted under the preceding part of this subsection, such party shall notify the others of such intended action.

(d) The TMP shall not bind the other Members to a settlement agreement without the approval of a majority in interest of the Members. If any Member enters into a settlement agreement with the Secretary of the Treasury with respect to any Company items, as defined by Section 6231(a)(3) of the Code, it shall notify the other Members of such settlement agreement and its terms within thirty days from the date of settlement.

## ARTICLE 10.
## MISCELLANEOUS

SECTION 10.1 Notices. Any notice, demand, election or other communication (hereinafter called a "notice") that, under the terms of this Assignment or under any statute, must be or may be given by the parties hereto shall be in writing and shall be given by mailing the same by certified or registered mail, return receipt requested, postage-prepaid, addressed or by reputable overnight courier and by email to:

> To Gustavo:
> 39 W. 38th Street, 4th Floor
> New York, NY 10018

> With a copy to:

> Kaye Scholer, LLP
> 425 Park Avenue
> New York, NY 10021
> Attention: Marci Settle
> Email: msettle@kayescholer.com

To Bantam:
c/o Caleb D. Koeppel
700 Park Avenue, 3rd Floor
New York, NY 10021
Email: ckoeppel@bantamfunds.com

With a copy to:

      Pryor Cashman LLP
      7 Times Square
      New York, New York 10036-6569
      Attention: Eric B. Woldenberg
      Email: ewoldenberg@pryorcashman.com

All copies of notices to be sent to any party hereunder shall be sent in the same manner as required for notices. Either party may designate, by notice in writing to the other, a new or other address to which notices shall thereafter be given. Any notice given hereunder (other than a notice of a new address or additional address for notice purposes) shall be deemed given when received as hereinabove provided. Any notice of a new or additional address for notice purposes shall be deemed given on the date upon which the same is received by the addressee thereof.

SECTION 10.2 <u>Complete Agreement.</u> This Agreement fully sets forth all of the agreements and understandings of the parties with respect to the Company and supersedes any prior agreements of the parties. There are no representations, agreements, arrangements or understandings, oral or written, among the parties relating to the subject matter of this Agreement which are not expressly set forth herein.

SECTION 10.3 <u>Amendments.</u> This Agreement may be amended only upon the unanimous consent of the Members.

SECTION 10.4 <u>Severability.</u> This Agreement is intended to be performed in accordance with, and only to the extent permitted by, the applicable laws, ordinances, rules and regulations of the jurisdictions in which the Company engages in business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be held to be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected, but rather shall be enforced to the full extent permitted by law.

SECTION 10.5 <u>Ratification.</u> Each person who becomes a Member in the Company after the execution and delivery of this Agreement shall, by becoming a Member, be deemed thereby to ratify and agree to all prior actions taken by the Company and the Board of Managers.

SECTION 10.6  <u>Binding Upon Successors.</u>  This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  This Agreement shall become effective upon its execution and delivery by the Members.

SECTION 10.7  <u>Rights of Third Parties.</u>  None of the provisions of this Agreement shall be construed as having been made for the benefit of any creditor of either the Company or any of the Members, nor shall any of such provisions be enforceable (except as otherwise required by law) by any person not a party hereto.

SECTION 10.8  <u>Governing Law.</u>  Irrespective of the place of execution or performance, the validity and construction of this Agreement shall be governed by the laws of New York.

SECTION 10.9  <u>Captions.</u>  The captions, headings and titles contained in this Agreement are solely for convenience of reference and shall not affect the interpretation of this Agreement or of any provision hereof.

SECTION 10.10  <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall together constitute one instrument.

SECTION 10.11  <u>Sense and Gender of Words.</u>  All terms and words used in this Agreement, regardless of the sense or gender in which they are used, shall be deemed to include each other sense and gender unless the context requires otherwise.

IN WITNESS WHEREOF, the parties hereto have executed and acknowledged this Agreement as of the date first above written.

BANTAM DESIGNS, LLC *Group*

By: Caleb Koeppel   *MGR - MEMBER*
Title: Managing Member

**GUSTAVO CADILE, LTD.**

_____

By: Gustavo Cadile
Title:

**Not as a Member, but for purposes of Sections 5.3, 5.20 and 5.22 only:**

_____

Gustavo Cadile

**Not as a Member, but for purposes of Section 5.22 only:**

_____

John Coppola

27

IN WITNESS WHEREOF, the parties hereto have executed and acknowledged this Agreement as of the date first above written.

GROUP
**BANTAM DESIGNS, LLC**

By: Caleb Koeppel
Title: Managing Member

**GUSTAVO CADILE, LTD.**

By: Gustavo Cadile
Title: President

Not as a Member, but for purposes of
Sections 5.3, 5.20 and 5.22 only:

Gustavo Cadile

Not as a Member, but for purposes of
Section 5.22 only:

John Coppola

## EXHIBIT A

### MEMBERS' CAPITAL CONTRIBUTIONS; PERCENTAGE INTEREST

| Member | Capital Contribution | Percentage Interest |
|---|---|---|
| Gustavo Cadile, Ltd. | 0 | 65% |
| Bantam Design Group, LLC | $500,000* | 35% |

*Includes the contribution of (a) cash and (b) Promissory Notes in the outstanding aggregate principal amount of $140,450.

973279

## EXHIBIT B

## BOARD OF MANAGERS/MANAGEMENT

Name:                                          Designee Of:

Gustavo Cadile                                 Gustavo
John Coppola                                   Gustavo
Caleb Koeppel                                  Bantam
Wayne Sellers                                  Bantam

## CONTRIBUTION AND EXCHANGE AGREEMENT

THIS CONTRIBUTION AND EXCHANGE AGREEMENT (this "Agreement") is made as of this 5ᵗʰ day of November, 2009, by and between GUSTAVO CADILE, Ltd., a New York corporation ("GC"), BANTAM DESIGN GROUP, LLC, a New York limited liability company (the "Bantam") and GUSTAVO CADILE II, LLC a New York limited liability company (the "Company").

### WITNESSETH:

WHEREAS, GC desires to contribute all of the GC Assets (as defined below), subject to all of its liabilities and obligations, to the Company in exchange for membership interests in the Company as set forth in the Operating Agreement, pursuant to the terms, provisions and conditions herein; and

WHEREAS, Bantam desires to contribute all of the Bantam Assets (as defined below), subject to all of its liabilities and obligations, to the Company in exchange for membership interests in the Company as set forth in the Operating Agreement, pursuant to the terms, provisions and conditions herein.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.      GC Assets.  Upon, and subject to, the terms, covenants and conditions of this Agreement, GC shall contribute to the Company, and the Company shall acquire, all of GC's right, title and interest in, to and under all of the assets, properties and rights of every kind and description, tangible and intangible, of GC (collectively, the "GC Assets"), including without limitation:

(a)      all machinery, furniture, fixtures, equipment and other tangible personal property owned by GC and relating to GC's business, and all of GC's right, title and interest in and to any leases for any such tangible property;

(b)      all inventory of GC;

(c)      all prepaid expenses and deposits of GC to third parties;

(d)      all intellectual property of GC, including, without limitation, trademarks, trade names, service marks, copyrights (including the name "Gustavo Cadile" and any and all derivatives thereof) (the "Intellectual Property") and all of GC's right, title and interest in, to and under any licensed Intellectual Property;

315575

(e)     all of GC's right, title and interest in, to and under any contracts, purchase orders or agreements to which GC is a party relating to GC's business, including, without limitation, that certain lease, dated as of July 10, 2008, by and between GC and Haslacha 26, LLC for the property located at 39 West 38th Street, New York, NY, Suite 4W (the "Lease Agreement");

(f)     all general intangible items, customer lists and files, lead, mailing, circulation, purchaser and all other lists, accounts, books and records of GC and all other existing records of GC, and all computerized records, together with the related documentation used in connection therewith;

(g)     all claims, including but not limited to claims under GC's insurance policies, causes of action and choses in action of GC arising from or relating to GC's business;

(h)     all governmental approvals, authorizations, certifications, consents, variances, permissions, licenses, directives, and permits to or from, or filings, notices, or recordings to or with United States federal, provincial, state, and local governmental authorities;

(i)     all existing designs and works-in-progress relating to GC's business;

(j)     all accounts receivable;

(k)     all cash on hand and marketable securities; and

(l)     all goodwill of GC associated with GC's business.

Except for those obligations and liabilities contemplated by the contracts and agreements referred to in Section 1(e) or expressly referenced in Section 6 below, the Company shall not assume or agree to fulfill, perform or discharge any of the obligations or liabilities of GC under, pursuant to or in respect of the GC Assets, GC's business or otherwise.

2.     Bantam Assets. Upon, and subject to, the terms, covenants and conditions of this Agreement, Bantam shall contribute to the Company, and the Company shall acquire, all of Bantam's right, title and interest in, to the following (collectively, the "Bantam Assets"):

(a)     cash in the amount of $360,000;

(b)     Promissory Note in the principal amount of $60,000, dated May 5, 2009 made by GC for the benefit of Bantam (or one of its affiliates);

(c)     Promissory Note in the principal amount of $13,450, dated June 18, 2009 made by GC for the benefit of Bantam (or one of its affiliates);

(d)     Promissory Note in the principal amount of $30,000, dated July 2, 2009 made by GC for the benefit of Bantam (or one of its affiliates);

973268

(e)     Promissory Note in the principal amount of $15,000, dated July 23, 2009 made by GC for the benefit of Bantam (or one of its affiliates);

(f)     Promissory Note in the principal amount of $12,000, dated September 30, 2009 made by GC for the benefit of Bantam (or one of its affiliates); and

(g)     Promissory Note in the principal amount of $15,000, dated October 7, 2009 made by GC for the benefit of Bantam (or one of its affiliates), against which $10,000 has been drawn and is outstanding (the promissory notes set forth in (b) – (g) hereof, the "Promissory Notes").

Immediately following execution of this Agreement and the contribution of the Promissory Notes as set forth in Sections 2(b)-(g), the Promissory Notes shall be cancelled by the Company and the rights and obligations of the parties as set forth therein shall be null and void.

3.      GC Conveyance.  GC hereby contributes, assigns, transfers and conveys to the Company all of GC's right, title and interest in and to the GC Assets in exchange for which GC shall receive membership interests in the Company as shall be more particularly described in the Operating Agreement of the Company, dated as of the date hereof (the "Company Operating Agreement").

4.      Bantam Conveyance.  Bantam hereby contributes, assigns, transfers and conveys to the Company all of Bantam's right, title and interest in and to the Bantam Assets in exchange for which Bantam shall receive membership interests in the Company as shall be more particularly described in the Company Operating Agreement.

5.      Contributions.  The Company hereby accepts the contribution, assignment, transfer and conveyance of the GC Assets and the Bantam Assets and agrees to issue such membership interests therein to GC and Bantam, as applicable, as more particularly described in the Company Operating Agreement.  The stated value for the GC Assets (net of liabilities assumed by the Company) shall be $0.00 and the stated value of the Bantam Assets shall be $500,000.

6.      Liabilities.  The Company hereby assumes and agrees to fulfill, perform and discharge all the obligations and liabilities of GC pursuant to or in respect of (a) the third party loan payable by GC to Citibank, N.A. in the outstanding principal amount of $74,000.00 the ("Citibank Loan"); provided, however that the Company has agreed to accept only the obligations of GC under the Citibank Loan and not the actual loan itself; and provide, further, that the Company accepts only the obligations under the loan to the extent of (and not exceeding) $74,000.00 plus interest thereon accruing after the date hereof, (b) GC's accounts payable, (c) other liabilities payable in the ordinary course of GC's business (including liability under the Promissory Notes immediately prior to the contribution of the Bantam Assets) and (d) the GC Assets and GC's business, including without limitation all obligations and liabilities of GC in connection with any contracts or agreements to which GC is a party and which are included within the GC Assets, with the same force and effect as if the Company had incurred such obligation or liability or signed any such contract or agreement, provided that such assumption

973268

shall not apply to any contract or agreement which requires third party consent until such time as such consent has been obtained. Further, the Company hereby agrees to indemnify GC and John Coppola for any liability incurred by GC or John Coppola arising out of or relating to the Citibank Loan; provided, however that the maximum indemnity of the Company to GC and John Coppola under this Section 6 shall in no way exceed $74,000.00 plus interest thereon accruing after the date hereof.

7.      Consents. The parties shall cooperate and use commercially reasonable efforts to obtain the consent of any third party that may be required in connection with the conveyances contemplated hereunder; provided, however, that the party seeking such consent (the "Assignor") shall have no obligation to pay money (except for any de minimis amounts) or grant any accommodation to any third party in order to obtain any such consent. If any such third party requires a payment in order to consent as contemplated by this Section 5, the party seeking such consent shall promptly notify the other party (the "Assignee") of this additional cost and the parties shall negotiate in good faith an alternative to the transfers contemplated herein. Notwithstanding anything herein to the contrary, in the event that any such required consent is not obtained, the Assignor shall use its commercially reasonable efforts (i) to provide to the Assignee, at the Assignee's expense, the benefits of the applicable portion of the agreement which could not be so assigned, (ii) to cooperate in any reasonable and lawful arrangement designed to provide such benefits to the Assignee and (iii) to enforce at the request of the Assignee and for the account of the Assignee, at the Assignee's expense, any of its rights arising under any such agreement which was to be so assigned. To the extent such benefit is made available and/or such arrangement is created, the Assignee shall pay, perform and discharge fully all obligations of the Assignor under any such agreement and shall indemnify the Assignor against any claims, damages, costs, expenses or losses incurred by the Assignor arising from the Assignor's inability to obtain such consent in connection with such agreement.

8.      Taxes. GC shall pay any and all taxes imposed with respect to GC's business and the ownership or operation of GC's business and the GC Assets for all taxable periods (or portions thereof) ending on or prior to the date hereof, imposed upon the Company based, in whole or in part, upon the failure to comply with the bulk sales laws. The parties agree that any transfer taxes associated with the contribution of the GC Assets or the Bantam Assets set forth herein shall be borne by the Company.

9.      Intentionally Left Blank.

10.     GC Representations and Warranties. GC, John Coppola and Gustavo Cadile, jointly and severally, hereby represent and warrant to Bantam and the Company that as of the date hereof:

(a)     Organization and Ownership. GC is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. GC has all requisite power and authority to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted. GC is owned 48% by Gustavo Cadile, 48% by John Coppola and 2% by each of two separate individuals.

973268

(b)     Authorization.  GC has all requisite power and authority to enter into this Agreement and the Company Operating Agreement and to consummate the transactions contemplated hereby and thereby.  All acts and other proceedings required to be taken by GC to authorize the execution, delivery and performance of this Agreement and the Company Operating Agreement  and the consummation of the transactions contemplated hereby and thereby have been duly and properly taken.

(c)     Valid and Binding.  This Agreement and, when executed and delivered, the Company Operating Agreement, will constitute a valid and binding obligation of GC enforceable against it in accordance with its terms, except that (i) such enforcement may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or limiting creditors' rights generally (collectively, "Bankruptcy Laws") and (ii) the remedy of specific performance and injunctive and other forms of equitable relief, and the enforceability of this Agreement and the Company Operating Agreement, are each subject to certain equitable defenses and to the discretion of the court before which any proceeding may be brought ("Equitable Principles").

(d)     Financial Statements.  GC has furnished to Bantam and the Company true, correct and complete copies of (i) an unaudited balance sheets of GC for the year ended December 31, 2008 (the "Balance Sheet") and (ii) a statement of accounts receivable and a statement of accounts payable for the ten (10) month period ended October 31, 2009 (the "October Statement," and together with the Balance Sheet", the "GC Financial Statements").  The GC Financial Statements have been prepared by GC on the basis of the books and records maintained by GC in the ordinary course of business in a manner consistently used and applied throughout the periods involved, and present fully and fairly in all material respects the assets, liabilities and financial condition of GC as at the respective dates thereof.  The books and records of GC to which the GC Financial Statements relate are complete in all material respects, and fully and fairly reflect bona fide transactions set forth therein.

(e)     Undisclosed Liabilities.  There are no material liabilities of GC or any of its affiliates of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise (and there is no existing condition, situation or set of circumstances which would reasonably be expected to result in such a material liability) required to be disclosed by GAAP on the GC Financial Statements, except for liabilities (i) set forth on the GC Financial Statements, (ii) which have arisen after the date of the GC Financial Statement in the ordinary course of GC's business and (iii) the liabilities listed as being due and payable as of November 30, 2009 on the October Statement  (other than the obligations under the lease, Verizon and Rogers and Cohen which are continuing monthly obligations); and

(f)     Contracts and Commitments.  The lease for 39 W. 38th Street, New York, New York (the "Lease Agreement") is the only contract included in the GC Assets (copies of which have heretofore been delivered to the Company and Bantam) and describes all currently effective oral agreements and commitments, if any, that are

included in the GC Assets to which GC is a party (the "Contracts"). (i) All such Contracts constitute valid and binding agreements of GC and, to GC's knowledge, each other party thereto, enforceable in accordance with their terms, subject to Bankruptcy Laws and Equitable Principles, (ii) Other than the default of paying September and October monthly rent under the Lease Agreement (the "Rent Payments"), with respect to such Contracts there are no existing material defaults by GC or, to GC's knowledge, by any other party thereto and there is no event which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a material default under such Contracts by GC or, to GC's knowledge, by any other party thereto, (iii) GC is not restricted by agreement from carrying on in any geographic location the business of GC as and where conducted on the date hereof and (iv) except with respect to negotiations regarding a reduction in rent payable under the Lease, there are no negotiations pending or in progress to revise any such Contract.

(g)     Litigation.  There are no actions, causes of action, claims, suits, proceedings, orders, writs, injunctions or decrees pending or, to GC's knowledge, threatened against GC or affecting GC's business or the GC Assets, at law or in equity, or before or by any court or any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign. GC is not in default with respect to any order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign. GC is in material compliance with all laws applicable to GC's business and the GC Assets.

(h)     Real Property.  GC does not own any Real Property. The only lease for Real Property to which GC is a party is the Lease Agreement. The Lease Agreement is in full force and effect and is binding and enforceable in accordance with its terms, subject to Bankruptcy Laws and Equitable Principles. All rental and other charges payable pursuant to the terms and conditions of the Lease Agreement have been paid other than the Rent Payments. To GC's knowledge, there are no charges, offsets or defenses against the enforcement by the lessor thereunder of any agreement, covenant or condition on the part of GC to be performed or observed pursuant to the terms of the Lease Agreement. Other than the Rent Payments, there are no material defaults by GC of any agreement, covenant or condition on the part of GC to be performed or observed pursuant to the terms of the Lease Agreement. Other than regarding the Rent Payments, there are no actions or proceedings pending or, to GC's knowledge, threatened, by the lessor against GC under the Lease Agreement. Except for the security deposits under the Lease Agreement, the lessor does not hold any deposits for GC's accounts on the Lease Agreement. There are no defaults by the lessor under any agreement, covenant or condition to be performed or observed by the lessor pursuant to the terms of the Lease Agreement.

(i)     Intellectual Property.  GC owns or has valid licenses to use all Intellectual Property used by it in the ordinary course of its business. (i) The Intellectual Property used by GC is not the subject of any challenge received by GC in writing, and (ii) GC has not received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any Intellectual Property license to which GC is a party or by which it is bound.

973268

      (j)    Title to the Assets.  GC has good and marketable title to, or has a valid leasehold interest or valid license or other contractual rights in, the properties and assets used by it or located on its premises that are included within the GC Assets, free and clear of all encumbrances. The GC Assets are the only assets owned or used in the conduct of GC's business.

      (k)    Citibank Loan.  The Citibank Loan is due and payable on February 24, 2009 unless otherwise renewed by GC and Citibank (the "Maturity Date"), provided, however that Citibank, in its sole discretion, may deny GC's request for such renewal.  If the Citibank Loan is not renewed, GC shall have forty-eight (48) months from the Maturity date within which to pay the outstanding balance and interest on the Citibank Loan.  As of the date hereof, there is no default or event of default under the Citibank Loan and there is no event which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default or event of default under the Citibank Loan.

    11.    Bantam Representations and Warranties.  Bantam hereby represents and warrants to GC and the Company that as of the date hereof:

      (a)    Organization and Ownership.  Bantam is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York. Bantam has all requisite power and authority to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted.  Bantam is owned 75% by Bantam Holdings, LLC, a New York limited liability company, and 25% by Wayne Sellers.  Bantam Holdings, LLC is owned 100% by Caleb D. Koeppel and members of his family.

      (b)    Authorization.  Bantam has all requisite power and authority to enter into this Agreement and the Company Operating Agreement and to consummate the transactions contemplated hereby and thereby.  All acts and other proceedings required to be taken by Bantam to authorize the execution, delivery and performance of this Agreement and the Company Operating Agreement  and the consummation of the transactions contemplated hereby and thereby have been duly and properly taken.

      (c)    Valid and Binding.  This Agreement and, when executed and delivered, the Company Operating Agreement, will constitute a valid and binding obligation of Bantam enforceable against it in accordance with its terms, except that (i) such enforcement may be limited by or subject to Bankruptcy Laws and (ii) the remedy of specific performance and injunctive and other forms of equitable relief, and the enforceability of this Agreement and the Company Operating Agreement, are each subject to certain Equitable Principles.

      (d)    Title to Bantam Assets.  Bantam has valid title to and interest in the Promissory Notes free and clear of all encumbrances.

12.  Covenants. (a)  With respect to the Citibank Loan, GC, and John Coppola as guarantor thereof, hereby covenants and agrees that it or he, as applicable, shall not (i) make any further draws on the Citibank Loan without the prior consent of the Company or (ii) cause a default or an event of default under the Citibank Loan, provided that the Company satisfies its obligations under the Citibank Loan to the extent agreed to in Section 6 hereof. Further GC and John Coppola hereby covenant and agree that, if Citibank provides notice to GC that it intends not to renew the loan on or prior to the Maturity Date each shall use its or his respective reasonable efforts to renew or otherwise replace the Citibank Loan.

(b)  Simultaneously with the execution of this Agreement (or prior thereto) GC shall file with the appropriate governmental agencies any and all documents and or information required to be filed by GC in order to change the name of GC from "Gustavo Cadile, Ltd. to another name which shall not contain the words "Gustavo" or "Cadile."

(c)  As soon as practicable following the closing hereunder, the Company shall file any and all appropriate documents and information necessary to change the name of the Company from "Gustavo Cadile II, LLC" to "Gustavo Cadile, LLC".

13.  Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

14.  Entire Agreement. This Agreement, together with the Company Operating Agreement, is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof, and supersedes all prior understandings with respect thereto.

15.  Amendment. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument, signed by the party to be charged or by its agent duly authorized in writing, or as otherwise expressly permitted herein.

16.  Choice of Law. This Agreement shall be interpreted and enforced in accordance with the laws of the State of New York without reference to principles of conflicts of laws.

17.  Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original Agreement, but all of which, taken together, shall constitute but one and the same Agreement.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

GUSTAVO CADILE, LTD.

By:_____
   Name:  Gustavo Cadile
   Title:

BANTAM DESIGN GROUP, LLC

By:_____ / MCR -MEMBER
   Name: Caleb Koeppel
   Title: Managing Member

GUSTAVO CADILE II, LLC

By:_____
   Name: Wayne Sellers
   Title:  Chief Financial Officer

_____

John Copolla

_____

Gustavo Cadile

973268

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**GUSTAVO CADILE, LTD.**

By:_____
    Name: Gustavo Cadile
    Title:

**BANTAM DESIGN GROUP, LLC**

By:_____
    Name: Caleb Koeppel
    Title: Managing Member

**GUSTAVO CADILE II, LLC**

By:_____
    Name: Wayne Sellers
    Title: Chief Financial Officer

_____
John Copolla

_____
Gustavo Cadile

973268

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

I.

GUSTAVO CADILE, LTD.

By: _____
Name: Gustavo Cadile
Title: President

BANTAM DESIGN GROUP, LLC

By: _____
Name: Caleb Koeppel
Title: Managing Member

GUSTAVO CADILE II, LLC

By: _____
Name: Wayne Sellers
Title: Chief Financial Officer

_____
John Copella

_____
Gustavo Cadile

315575

## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** ("Agreement"), dated as of November 5th, 2009 (the "Effective Date") is entered into by and between **Gustavo Cadile II, LLC** (the "**Company**") a New York limited liability company with headquarters at 39 W.39th Street, Suite 4W, New York, NY 11018 and **Gustavo Cadile** (the "**Executive**") and together with Company, the "Parties," or each a "Party". Capitalized terms used but not otherwise defined herein shall have the meaning ascribed thereto in the Company's Operating Agreement dated as of November 5th, 2009 (the "**Operating Agreement**"). The Parties hereto agree as follows:

Section 1. Employment.

1.1    Title. The Executive shall be employed by Company in the capacity of President. Executive shall report to the Board of Managers of Company.

1.2    Duties. During the term of his employment, the Executive will be responsible for all aspects of the design and manufacture of women's apparel, obtaining and developing new clients and new business for the Company and any and all responsibilities delegated to Executive or Gustavo Cadile Ltd. ("**GC**") under the Operating Agreement. Executive shall also perform additional duties consistent with his position and reasonably requested by the Board of Managers. Executive agrees to perform his duties hereunder faithfully, diligently and to the best of his ability and will dedicate all his professional time exclusively towards the fulfillment of his duties under this Agreement.

1.3    Reporting. Executive shall report to the Board of Managers. Executive shall fully inform and apprise the Board of Managers of all matters pertaining to the business of the Company.

1.4    Authority. Except as otherwise set forth in the Operating Agreement, Executive shall have no authority to enter into or bind Company for any obligation, liability, or contract, oral, written or otherwise, without the prior written approval of the Board of Managers.

1.5    Term of Employment. The term of the employment of the Executive pursuant to this Agreement shall commence on the Effective Date and shall continue for an initial period of five (5) years. Following the initial period, this Agreement shall automatically renew for successive five (5) year terms unless (a) Executive terminates his employment with the Company in his sole discretion or (b) Executive is terminated by the Company for Cause (the "Term"). With the exception of Sections 4, 5 and 6, which shall survive termination, this Agreement shall terminate upon the termination of Executive's employment.

Section 2. Compensation.

2.1     Base Salary. In consideration of Executive's services, effective as of the Effective Date, Executive shall receive a Base Salary of Three Thousand Dollars ($3,000) per month. From time to time, but in no event less than annually, the Board of Managers shall review Executive's Base Salary and determine, based on the financial operations of the Company and the performance of Executive, whether an increase in Base Salary is warranted. Notwithstanding the foregoing, a portion of the Base Salary of Executive may be deferred (the "Deferred Compensation") if there is insufficient capital in the Company to satisfy payment of the Base Salary and the other obligations of the Company in the ordinary course of its business. In the event a portion of Executive's salary is so deferred, the Financial Manager, or the Board, as the case may be, in accordance with the terms of the Operating Agreement, shall determine an appropriate and reasonable schedule to pay the Executive the Deferred Compensation so as not to materially and adversely impact the business and operations of the Company. Base Salary shall be paid to Executive as required by law, either as W-2 income or a guaranteed payment.

2.2     Other Benefits. Executive will be entitled to receive employee benefits including medical, dental, life insurance and disability insurance plans, or similar benefit plan of Company. Executive shall be entitled to four weeks of paid vacation per year of employment, provided that Executive may not accrue more than thirty (30) unused vacation days at any time.

2.3     Expenses. Company shall reimburse Executive for all reasonable personal expenses actually incurred or paid by him in the performance of his services on behalf of the Company, including, without limitation, reasonable travel and entertainment expenses.

Section 3. Termination or Extension of Employment.

3.1     General. The employment of Executive may be terminated (i) by the Board of Managers, for "Cause" (as defined in Section 3.2 hereof); or (ii) as a result of the Executive's "Permanent Disability" (as defined in Section 3.3 hereof), or (iii) death; or (iv) by the Executive. On termination of employment, all rights to compensation under this Agreement terminate except as specifically provided in this Section 3.

3.2     Cause. For purposes of this Agreement, the term "Cause" shall mean: (i) Executive's commission of embezzlement against the Company, its clients, accounts or its affiliates, including the receipt of the Executive of bribes, material gifts, or gratuities in exchange for any services of the Company; or (ii) Executive's engaging in knowing and intentional illegal conduct which has a material detrimental impact on the Company; or (iii) Executive's habitual drug or alcohol abuse which has a material detrimental impact on the Company; (iv) Executive's willful refusal to use his good faith efforts to perform his material duties and responsibilities which failure is not cured within ten (10) days following receipt of notice from the Board of Managers of such failure; or (v) Executive's material violation of any of the material written rules or regulations of the Company in effect on the date hereof or as otherwise agreed to by the Executive for which dismissal is a written policy of the Company, which violation is not remedied or capable of being remedied within thirty (30) days of Executive's receipt of written notice from the Company specifically delineating such claimed violation.

973628

2

3.3     Permanent Disability. For purposes of this Agreement, "Permanent Disability" shall mean the inability of the Executive, even with reasonable accommodation, to perform the essential functions of his position hereunder for at least 180 consecutive days or for at least 240 days in any 365 period as a result of a permanent physical or mental disability, as determined in the reasonable opinion of a physician appointed by the Company or, if Executive objects to the findings of such physician, of an independent physician reasonably acceptable to the Company and the Executive.

3.4     Compensation on Termination with Cause or at Executive's Discretion. If the Executive's employment with the Company hereunder is terminated by Company prior to the expiration of this Agreement with Cause or Executive opts to terminate his employment with the Company, then on the date of termination, the Executive shall receive all accrued but unpaid Base Salary and benefit payments for the previous calendar year(s) at the time of termination and payments for unreimbursed expenses and accrued non-expired vacation earned through the date of termination.

3.5     Cash Payments in the Event of Permanent Disability. If the Executive suffers a Permanent Disability (as determined in accordance with Section 3.3 hereof), Company or the Executive may terminate the Executive's employment on written notice thereof, and the Executive shall receive or commence receiving, as soon as practicable in accordance with the terms of this Agreement (a) amounts payable pursuant to the terms of any disability insurance policy or similar arrangement which Company maintains during the term hereof, if any; (b) such other payments under applicable plans or programs, if any; and (c) the payments otherwise due and payable under Section 3.4 hereof through the termination date.

3.6     Payments in the Event of Death. In the event of the Executive's death during the Term, the Executive's estate or designated beneficiaries shall receive or commence receiving, as soon as practicable in accordance with the terms of this Agreement (a) any death benefits provided under the benefit programs, plans and practices referred to in Section 2.4 hereof in accordance with their respective terms, if any; (b) such other payments under applicable plans or programs to which the Executive's estate or designated beneficiaries are entitled pursuant to the terms of such plans or programs, if any; and (c) the payments otherwise due and payable under Section 3.4 hereof through his date of death.

Section 4.     Indemnification. The Company shall indemnify Executive against any loss, liability, damages or expenses, including, without limitation, reasonable attorneys' fees, incurred by him in connection with the defense of any action, suit, investigation or proceeding or similar legal activity, regardless of whether criminal, civil, administrative or investigative in nature (a "Claim"), to which he is made a party by reason of his being or having been employed by Company as President, or by reason of his performance of his duties hereunder, including, but not limited to, any action claiming infringement of any copyright, patent, trademark, trade secret or other property right. Executive's right of indemnification specifically excludes legal actions that are the result of the Executive's intentional misconduct or intentional breach of a representation or covenant in any agreement between the Company and the Executive or for which Company is indemnified pursuant to paragraph 4 of this Agreement. The Company shall reimburse Executive, in cash or certified check, for any payment made or loss incurred in respect of any liability, obligation, claim or breach to which the foregoing indemnity relates, provided

that the Executive shall give Company written notice of such liability, obligation, claim or breach, and, in the case of claims of third parties, afford the Company a reasonable opportunity to defend against or contest the same at the Company's expense. The Executive shall not settle or compromise any such claim by a third party without the prior written consent of the Company, which shall not be unreasonably withheld; provided, however, that no such consent shall be required if the Company has been afforded the opportunity to assume at the Company's expense, full responsibility for the defense or contest of such claim and has declined to do so.

Section 5. Ownership of Creative Assets.

All Executive Work Product as defined herein, shall be and remain the property of Company. Executive Work Product means all Confidential Information (as defined below), and also includes all creative products, intellectual property, inventions, concepts, designs, garments or ideas formulated or created by Executive or any other employee or principle of Company during Executive's employment under this Agreement, in connection with or relating to Executive's employment, whether or not reduced to writing or tangible material or actually or constructively reduced to practice. Executive agrees that all Executive Work Product shall be considered a "work for hire," as commonly understood, belonging to Company. To the extent that any such Executive Work Product may not be considered works for hire, Executive agrees to automatically assign upon creation, all such Executive Work Product to Company, including any and all intellectual property rights in the material, without any further consideration. Executive agrees that Company shall have the exclusive rights to use the Executive Work Product in all forms, original or derivative for all purposes. Executive agrees to execute any and all necessary documentation to demonstrate this assignment and further agrees to cooperate with Company in the protection of the Executive Work Product throughout the world. The obligations stated in this paragraph are perpetual and survive the period of employment.

The term "Confidential Information" includes, without limitation, information not in the public domain and not previously disclosed to the public or to the trade by the Employer with respect to client lists, facilities and methods, Trade Secrets (as defined below) and other intellectual property, systems, procedures, manuals, confidential reports, price lists, financial information (including the revenues, costs or profits associated with Company, business plans, prospects and opportunities) in digital or printed form, regardless of who actually purchased or produced them.

The term "Trade Secrets" includes, without limitation: (1) information on Company clients such as budgets, contracts, strategic plans, business operations and internal organizational charts, release schedules, upcoming program schedules, marketing schedules, product launches and similar information; (2) knowledge of Company operations, systems, procedures, manuals, confidential reports, price lists, financial information (including the revenues, costs or profits associated with Company, business plans, prospects and opportunities); and (3) knowledge of Company's production resources and vendors. These obligations are perpetual and extend beyond the period of employment.

Section 6. Confidentiality, Secrecy and Non-Competition.

6.1    Trade Secrets. Executive agrees not to directly or indirectly disclose any Trade

Secret or Confidential Information that he may have learned by reason of his association with the Employer. Nor shall he personally use such secret or Confidential Information for the benefit of any other business.

     6.2    Exclusive Property.  All Confidential Information is exclusive property of Company. All business papers, records and documents kept or made by Executive relating to the business shall be and remain the exclusive property of Company. Upon termination of employment or resignation therefrom, Executive shall promptly return all business records or documents to Company whether or not any dispute exists between Company and Executive regarding the termination of employment.

     6.3    Non-Competition; Non-Solicitation.  Executive hereby acknowledges and agrees that during the course of Executive's employment with the Company and during the three (3) year period following termination of his employment with the Company pursuant to the terns of this Agreement (the "Restricted Period"), neither Executive, nor any affiliate thereof, shall (a) directly or indirectly enter into, start or conduct any business if the same is competitive in any way with the primary business of the Company or other businesses which the Company is planning to enter into within six (6) months of commencement of the Restricted Period as evidenced by reasonable written evidence (which shall include emails) of such plans (b) directly or indirectly solicit or hire any employee of the Company or any of its Affiliates who is an employee of the Company or any of its Affiliates as of the date hereof (or who is hereafter hired by the Company or any of its Affiliates) and who has devoted any material portion of his or her time to the business of the Company or its Affiliates. Notwithstanding the foregoing, the Restricted Period shall be reduced to two (2) years following termination of employment if GC's employment with the Company is terminated more than five (5) years after the date hereof. The Company and Executive hereby acknowledge that, as of the date hereof, the Company's primary business is the design and/or sale of women's dresses.

     6.4    Injunctive Relief.  Without intending to limit the remedies available to Company, the Executive acknowledges that a breach of the covenants contained in this Section may result in irreparable injury to Company for which there is no adequate remedy at law, that it will not be possible to measure precisely damages for such injuries and that, in the event of such a breach , Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction demanding specific performance or restraining the Executive from engaging in activities prohibited by Section 6.

     6.5    Section Severable. Executive acknowledges that a breach of the covenants contained in this Section may result in irreparable injury to Company and that enforcement of this Section 6 is severable and independent from any other action arising out of a breach of the representations and covenants contained in this Agreement.

Section 7. Assignment.  Neither this Agreement nor any rights or obligations hereunder shall be assignable or otherwise subject to hypothecation by the Executive (except by will or by operation of the laws of intestate succession) or by Company.

Section 8. Notices.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficiently given if delivered in person, or mailed by certified

973628

first class mail, postage prepaid, or sent by a nationally-recognized overnight courier service, addressed to the party to be notified at the address(es) specified below (or such other address as may be specified by notice in this manner) and by emailed to:

Notice to Company:

c/o Caleb D. Koeppel
700 Park Avenue
New York, NY 10021
Email: calebkoeppel@bantamfunds.com

With a copy to:

Eric B. Woldenberg
Pryor Cashman, LLP
7 Times Square
New York, NY 10036-6569
Email: ewoldenberg@pryorcashman.com

Notice to Executive:

Gustavo Cadile
38 W. 38th Street, 4th Floor
New York, NY 10018

With a copy to:

Kaye Scholer, LLP
425 Park Avenue
New York, NY 10021
Attention: Marci Settle
Email: msettle@kayescholer.com

Notices shall be deemed given as of the date delivered if personally delivered, one business day after the date entrusted to a nationally-recognized courier service for overnight delivery, or three business days after the date entrusted to the U.S. postal service.

Section 9. <u>Counterparts; Fax as Original</u>. This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. A fax shall be deemed an original. ·

Section 10. <u>Headings</u>. The headings in this Agreement are for convenience only and in no way define, limit, or describe the scope or intent of any provision of this Agreement.

Section 11. <u>Waiver</u>. The waiver by any Party of noncompliance by any other Party of any term or provision of this Agreement shall not be construed as a waiver of any other non-compliance.

Section 12. <u>Severability</u>. If any one or more of the provisions contained in this Agreement shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof.

973628

6

Section 13. <u>Complete Agreement; Amendments</u>. The foregoing is the entire agreement of the Parties with respect to the subject matter hereof and may not be amended, supplemented, canceled or discharged except by written instrument executed by all Parties hereto.

Section 14. <u>Governing Law</u>.   THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS RULES OR PRINCIPLES.

Section 15. <u>Dispute Resolution</u>.  Any dispute or claim in relation to this Agreement shall be resolved amicably by mutual consultation by and among the Parties hereto. If resolution is not forthcoming any Party hereto may file action in the Courts of the State of New York or Federal Courts within the State of New York. The Parties agree that this shall be the sole jurisdiction recognized under this Agreement.

973628

7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**GUSTAVO CADILE II, LLC - COMPANY**          **GUSTAVO CADILE - EXECUTIVE**

By:   Wayne Sellers

Title:  Chief Financial Officer          Gustavo Cadile

973628

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**GUSTAVO CADILE II, LLC – COMPANY**

By: Wayne Sellers
Title: Chief Financial Officer

**GUSTAVO CADILE – EXECUTIVE**

Gustavo Cadile

973618

**BANTAM DESIGN GROUP LLC**
**c/o Caleb D. Koeppel**
**733 Park Avenue**
**New York, New York  10021**

February 10, 2015

**_Via Email and Overnight Delivery_**
Memeca Dell'Acqua Ltd.
c/o Studio 38, LLC
260 West 36th Street, Suite 901
New York, New York  10018
Attn.: Gustavo Cadile

> **Re:    _"Gustavo Cadile" and "Memeka" Trademarks_**

Dear Gustavo:

As you may recall, pursuant to the Contribution and Exchange Agreement (the "Contribution Agreement"), dated November 5, 2009, between Memeca Dell'Acqua Ltd. (then known as Gustavo Cadile, Ltd., "Memeca"), Bantam Design Group LLC ("Bantam") and Gustavo Cadile LLC (then known as Gustavo Cadile II, LLC, "GC Ltd."), Memeca contributed and assigned all of its rights and interests in the entirety of its intellectual property (the "IP") to GC Ltd. Specifically, without limitation, Memeca contributed all of its "trademarks, trade names, service marks, copyrights (including the name 'Gustavo Cadile' and any and all derivatives thereof)" to GC Ltd.  At the time the Contribution Agreement was made, you personally represented and warranted to Bantam and GC that Memeca owned all of the IP that was conveyed to GC Ltd.  I have enclosed a copy of the Contribution Agreement for your reference.

Beginning in 2009, GC Ltd. developed women's clothing lines under both the "Gustavo Cadile" and "Memeka" trade names (the "Marks"), which had been contributed pursuant to the Contribution Agreement.  Accordingly, I was surprised to recently learn that in 2013, you caused GRMAR, LLC ("GRMAR"), another entity you are affiliated with but which is not affiliated with Bantam or GC Ltd., to file trademark applications (now registered under Registration Nos. 4432228 and 4390867) for each of the Marks.

In doing so, GRMAR caused its attorneys, Lackenbach Siegel LLP, to declare to the United States Patent and Trademark Office that "no other person, firm, corporation or association has the right to use the mark in commerce."  In light of GC Ltd.'s indisputable ownership of the Marks at the time the registration applications were filed, that declaration was false and the registrations themselves were fraudulently obtained.

Accordingly, please allow this letter to serve as a demand, on behalf of both Bantam and GC Ltd., that (i) you and GRMAR immediately take all steps necessary to assign ownership of the registrations to GC Ltd., and thereafter, to protect all of GC Ltd.'s rights therein, and (ii) that

Memeca Dell'Acqua Ltd.
Attn.: Mr. Gustavo Cadile
February 10, 2015
Page 2

you, GRMAR and Studio 38, LLC, and the agents of each of them, immediately cease using the Marks for purposes other than those related to GC Ltd.'s business. Please be advised that if the foregoing demands are not satisfied by February 20, 2015, Bantam intends to pursue any and all legal remedies, both on its own behalf and on behalf of GC Ltd., with respect to the fraudulent registration of the Marks and your unauthorized use thereof.

All rights, remedies and defenses of each of Bantam and GC Ltd. are expressly reserved.

Sincerely,
**BANTAM DESIGN GROUP LLC**


By: _____/s/_____
Name: Caleb D. Koeppel
Title: Manager

Enc.

cc:     Howard N. Aronson, Esq.
        Lackenbach Siegel LLP
        1 Chase Road
        Scarsdale, New York 10583
        (via email only)